Steven Weinmann (SBN 190956)
Steven.Weinmann@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Trisha K. Monesi (SBN 303512)
Trisha.Monesi@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 556-4811
Facsimile:   (310) 943-0396

Russell D. Paul (*pro hac vice* pending)
rpaul@bm.net
Amey J. Park (*pro hac vice* pending)
apark@bm.net
BERGER MONTAGUE P.C.
1818 Market Street, Suite 3600
Philadelphia, PA  19103
Telephone:   (215) 875-3000
Facsimile:   (215) 875-4604

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GORDON ARMSTRONG, ANDREW VIERRA, SANDY MORENO and STEPHEN MERMAN, individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>SUBARU OF AMERICA, INC. and FUJI HEAVY INDUSTRIES, LTD.,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1) Violations of California's Consumers Legal Remedies Act, Cal. Civ. Code §1750 *et seq.*<br>(2) Violations of Unfair Competition Law, Cal. Bus. & Prof. §17200 *et seq.*<br>(3) Breach of Implied Warranty pursuant to Song-Beverly Consumer Warranty Act<br>(4) Violations of the Colorado Consumer Protection Act, Colo. Rev. Stat §6-1-101 *et seq.*<br>(5) Breach of Implied Warranty of Merchantability, Colo. Rev. Stat. §4-2-313 & 4-2.5-212<br>(6) Breach of Express Warranty under the Magnuson-Moss Warranty Act<br>(7) Breach of Implied Warranty under the Magnuson-Moss Warranty Act<br>(8) Unjust Enrichment<br><br>**DEMAND FOR JURY TRIAL** |

1.      Plaintiffs Gordon Armstrong, Andrew Vierra, Sandy Moreno, and Stephen Merman ( "Plaintiffs") bring this action for themselves and on behalf of all persons in the United States who purchased or leased any 2017-2019 Subaru Forester, 2017-2019 Subaru Outback, or 2017-2019 Subaru Legacy ("Class Vehicles") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced by Subaru of America, Inc. ("SOA") and Fuji Heavy Industries, Ltd. ("Fuji") (together, "Defendants" or "Subaru"). Plaintiffs allege as follows:

## INTRODUCTION

2.      This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

3.      Defendants manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles' windshields were defective and dangerous because they are spontaneously and/or unreasonably cracking, chipping and otherwise breaking (the "Defect"). Further, replacement windshields provided by Defendants and paid for by Plaintiffs and the Class suffer from the same defect and therefore are equally defective and dangerous.

4.      Upon information and belief, the Class Vehicles all contain the same type of windshields, and the Defect is inherent in each Class Vehicle and was present at the time of sale.

5.      Upon information and belief, Defendants knew that the Class Vehicles contain this Defect but have concealed their knowledge from the public and continue to deny that the Defect exists.

6.      A large number of Class Vehicle owners and lessees have reported experiencing the Defect, often shortly after purchase. One consumer complained to the National Highway Transportation Safety Authority ("NHTSA") as follows:

> MY WINDSHIELD IS CRACKED FOR THE 2ND TIME NOW IN ITS FIRST YEAR OF OWNERSHIP. THE FIRST TIME IT CRACKED IT WAS BECAUSE OF A PEBBLE STRIKE FROM THE ROAD.

1
2
3
4
5
6
7
8
9

EXTREMELY SMALL FRAGMENT STRUCK THE GLASS, MADE A POCK MARK, AND THE WINDSHIELD WAS REPLACED. TODAY, LESS THAN A MONTH LATER A NEW CRACK APPEARED WHILE DRIVING WITHOUT ANY STRIKE FROM AN OBJECT. SUBARU DEALER CLAIMS IT WAS STRUCK BUT FIND A CRACK ONLY WITHOUT ANY POINT ALONG IT OF AN IMPACT MAKES ME VERY VERY SUSPICIOUS. NOW I HAVE TO WAIT FOR THE INSURANCE COMPANY TO SETTLE ON CHARGES AND SEND A CHECK BEFORE THE NEXT WINDSHIELD CAN BE APPLIED. MY WIFE AND I WERE CALMLY DRIVING ON COMPLETELY PAVED ROADS WHEN WE BOTH WATCHED THE CRACK APPEAR AND GROW DURING OUR DRIVE. :-( I HAVE DRIVEN FOR 50+ YEARS, AND OWNED 20+ CARS. I'VE NEVER HAD THIS HAPPEN.[1]

10
11
12
13
14
15

7.    The Defect poses a serious safety hazard to drivers, passengers, and pedestrians. A spontaneously cracking or severely cracked windshield can impair the driver's view and distract the driver. Moreover, cracks in the windshield prevent the safe and proper operation of Subaru's "EyeSight® Driver Assist Technology". According to Subaru,

16
17
18

EyeSight Driver Assist Technology is capable of detecting vehicles traveling in front and can activate in order to mitigate or even avoid the collision. The system reduces rear-end crashes with injuries by up to 85 percent according to IIHS. *

19
20
21
22

With the help of two Subaru-developed color cameras mounted behind the windshield, EyeSight can identify vehicles traveling in front, traffic lanes, obstacles and pedestrians. The system has helped reduce the rate of pedestrian-related insurance claims by 41 percent according to the Highway Loss Data Institute. **[2]

23
24
25

8.    In addition to this obvious safety hazard putting their personal safety and that of the public at risk, vehicle owners or lessees incur substantial monetary losses because Defendants refuse to replace the broken windshields

26
27
28

---

[1] https://www.nhtsa.gov/vehicle/2018/SUBARU/OUTBACK/SW/AWD (last accessed November 13, 2019).
[2] See Subaru Press Release, Oct. 16, 2018. "Subaru Sells One-Millionth Vehicle With Eyesight® Driver Assist Technology." available at: http://media.subaru.com/pressrelease/1350/120/subaru-sells-one-millionth-vehicle-eyesight-driver-assist

1  under warranty. In addition to the windshield replacement cost, consumers incur

2  other expenses resulting from the defect, such as having the Eyesight system

3  recalibrated. Furthermore, many consumers report having to replace their

4  windshields multiple times due to the Defect because their windshields are being

5  replaced with equally defective products.

6     9. Defendants were aware of the Defect from pre-production testing,

7  design failure mode analysis, calls to their customer service hotline, a Technical

8  Service Bulletin (TSB) that it sent to its dealers but not shared directly with

9  consumers that detailed the same Defect in prior model years for two of the three

10  Class Vehicles, and customer complaints made to dealers.  However, this

11  knowledge and information was exclusively in the possession of Defendants and

12  their network of dealers and, therefore, unavailable to consumers.

13     10. The Defect is material because it poses a serious safety concern.

14  As attested by Class Members in scores of complaints to the National Highway

15  Traffic Safety Administration ("NHTSA"), and other online forums, the Defect

16  can impair any driver's visibility, cause a distraction, affect Subaru's

17  "EyeSight$^{®}$ Driver Assist Technology," and greatly increase the risk of

18  collision.

19     11. The Defect is also material because consumers incur significant and

20  unexpected repair costs. Defendants' failure to disclose, at the time of purchase,

21  the Defect is material because no reasonable consumer expects to spend

22  hundreds of dollars to repair or replace windshields that either crack

23  spontaneously or only with a mild impact that would not result in cracking had

24  the Defect not existed.

25     12. Had Defendants disclosed the Defect, Plaintiffs and Class Members

26  would not have purchased the Class Vehicles or would have paid less for them.

27

28

**THE PARTIES**

**Plaintiff Gordon Armstrong**

13.     Plaintiff Armstrong is a California resident who lives in Santa Clarita, California.

14.     On June 3, 2019, Plaintiff Armstrong purchased a used 2017 Subaru Outback (VIN 4S4BSETC4H3320210) from First Kia of Simi Valley in Simi Valley, California.

15.     Plaintiff Armstrong purchased his vehicle primarily for personal, family, or household use.

16.     Passenger safety and reliability were important factors in Plaintiff Armstrong's decision to purchase his vehicle. Before making his purchase, Plaintiff Armstrong did an online search for the vehicle, including on "Google," "Youtube", Edmunds.com, KBB.com, Carfax,.com autodtrader.com, cars.com, truecar.com, and carmax.com. He watched SOA television ads, visited SOA's website to research the vehicle, and test drove his vehicle. He visited Subaru Sherman Oaks in Van Nuys, CA to learn more about and inspect the model vehicle. Plaintiff Armstrong believed that the Outback would be a safe and reliable vehicle. When Plaintiff Armstrong purchased his vehicle, he was unaware that the vehicle's windshield contained the Defect.

17.     Defendants' omissions were material to Plaintiff Armstrong. Had Defendants disclosed their knowledge of the Defect before he purchased his vehicle, Plaintiff Armstrong would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Armstrong would not have purchased his vehicle, or would have paid less for it.

18.     Specifically, on September 9, 2019, with approximately 30,000 miles on the odometer of his Subaru Outback, a pebble or small stone hit his windshield and created a small chip less than one-half inch long near the wiper blade. Over the course of the next 5 weeks, the chip slowly and steadily grew

into a T-shaped crack, with the top of the T comprised of one crack approximately 8 inches long and the other crack approximately 14 inches long.



19.     On October 15, 2019, Plaintiff Armstrong took his vehicle to Santa Clarita Auto Glass, Inc., where his cracked windshield was replaced with a new Subaru OEM windshield, paying $490 for the repair.

20.     Upon information and belief, the replacement windshield supplied by Subaru suffers from the same defect as the original windshield installed in Plaintiff Armstrong's Class Vehicle.

21.     At all times, Plaintiff Armstrong, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**Plaintiff Sandy Moreno**

22.     Plaintiff Moreno is a California citizen who resides in Stockton, California.

23.     On October 28, 2018, Plaintiff Moreno purchased a new 2019 Subaru Outback (VIN 4S4BSANC4K3216359) from Elk Grove Subaru in Elk

Grove, California.

24.     Plaintiff Moreno purchased her vehicle primarily for personal, family, or household use.

25.     Passenger safety and reliability were important factors in Plaintiff Moreno's decision to purchase her vehicle. She had previously owned a 2003 Subaru WRX and was familiar with the brand. She went to Modesto Subaru in Modesto, California where she test drove a Subaru Outback. She later went to Elk Grove Subaru in Elk Grove, California where she spoke extensively with a salesperson before she purchased the vehicle from that dealership. She had also seen Subaru television ads. Plaintiff Moreno believed that the Outback would be a safe and reliable vehicle. When Plaintiff Moreno purchased her vehicle, she was unaware that the vehicle's windshield contained the Defect.

26.     Defendants' omissions were material to Plaintiff Moreno. Had Defendants disclosed their knowledge of the Defect before she purchased her vehicle, Plaintiff Moreno would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Moreno would not have purchased her vehicle, or would have paid less for it.

27.     Specifically, on December 31, 2018, with approximately 5,000 miles on the odometer of her Subaru Outback, a pebble or small stone hit her windshield in the lower driver's side corner. She expected that a small chip in the windshield would result. Instead, a large crack appeared.

28.      On January 7, Plaintiff Moreno took her vehicle to Safelite Auto Glass in Stockton, California where her cracked windshield was replaced with a new Subaru OEM windshield, paying $100.00 for the repair, which was the amount of her insurance deductible.

29.     Upon information and belief, the replacement windshield supplied by Subaru suffered from the same defect as the original windshield installed in Plaintiff Moreno's Class Vehicle.

30.     On February 27, 2019, Plaintiff Moreno was driving to Elk Grove Subaru dealership for a basic vehicle service appointment when a chip appeared in her recently replaced Subaru windshield. She does not recall any debris hitting the windshield. That day, after the service appointment, she immediately drove the vehicle over to Safelite Auto Glass in Stockton, California and had the chip filled in at a cost of $75.

31.     At all times, Plaintiff Moreno, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**Andrew Vierra**

32.     Plaintiff Vierra is a California citizen who resides in Fullerton, California.

33.     On May 26, 2019, Plaintiff Vierra purchased a new 2019 Subaru Outback (VIN 4S4BSANC3K3333186) from Ocean Subaru in Fullerton, California.

34.     Plaintiff Vierra purchased his vehicle primarily for personal, family, or household use.

35.     Passenger safety and reliability were important factors in Plaintiff Vierra's decision to purchase his vehicle. He test drove a Subaru Outback at Ocean Subaru. He spoke extensively with a salesperson at Ocean Subaru before he purchased the vehicle from that dealership and read promotional brochures about the vehicle at the dealership. He ran a Google search of the vehicle before he purchased, and carefully reviewed information presented through the search results. As a result of this search, he viewed Youtube Subaru Outback new car video reviews, Subaru Outback videos posted by Consumer Reports, videos posted by independent Subaru Outback owners, and videos posted by Subaru itself. He had also seen Subaru television ads. Plaintiff Vierra believed that the Outback would be a safe and reliable vehicle. When Plaintiff Vierra purchased his vehicle, he was unaware that the vehicle's windshield contained the Defect.

1
2
3
4
5

36.     Defendants' omissions were material to Plaintiff Vierra. Had Defendants disclosed their knowledge of the Defect before he purchased her vehicle, Plaintiff Vierra would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Vierra would not have purchased her vehicle, or would have paid less for it.

6
7
8
9
10
11

Specifically, on or around November 14, 2019, with approximately 10,500 miles on the odometer of his Subaru Outback, Plaintiff Vierra was driving his vehicle when he heard a popping sound, but saw no visual evidence of any impact. He later noticed a fishhook-shaped crack in the windshield behind the rear-view mirror. Within several days, this crack extended to the middle of the driver's side of the windshield.

12
13
14
15
16

37.     Soon after the crack appeared, Plaintiff Vierra called Ocean Subaru and he was told that the dealership would not repair his windshield under any warranty. He then called his insurance provider who told him to have the windshield replaced at All Star Glass and that he would be responsible to pay $379 for the replacement.

17
18
19
20
21

38.     On November 18, 2019, Allstar Glass in La Habra, California sent an agent to Vierra's residence to repair his windshield. The agent inspected the windshield and determined that it could not be done at that location and that it needed to be taken to All Star Glass' business location. Vierra scheduled an appointment with All Star Glass for November 26, 2019.

22
23
24
25
26
27
28

39.     On November 26, 2019, Plaintiff Vierra took his vehicle to All Star Glass in San Diego, California where his cracked windshield was replaced with a new Subaru OEM windshield. He was to be charged $250 for the repair, which was the amount of his insurance deductible. However, the windshield installation technician could not properly calibrate the vehicle's front view camera with the new windshield and informed Vierra that a new windshield had to be ordered and another service appointment scheduled for a second attempt at replacing the

1  windshield.

2      40.     Upon information and belief, any replacement windshield supplied

3  by Subaru will suffer from the same defect as the original windshield installed in

4  Plaintiff Vierra's Class Vehicle.

5      41.     At all times, Plaintiff Vierra, like all Class Members, has driven his

6  vehicle in a manner both foreseeable and in which it was intended to be used.

7  **Stephen Merman**

8      42.     Plaintiff Merman is a Colorado citizen who resides in Golden,

9  Colorado.

10     43.     On July 15, 2019, Plaintiff Merman purchased a certified pre-owned

11  2018 Subaru Forester (VIN JF2SJAGC8JH5560641) from AutoNation Subaru

12  West in Golden, Colorado.

13     44.     Plaintiff Merman purchased his vehicle primarily for personal,

14  family, or household use.

15     45.     Passenger safety and reliability were important factors in Plaintiff

16  Merman's decision to purchase his vehicle. He had directly previously owned a

17  2016 Subaru Outback and other Subarus before that and was familiar with the

18  brand. Before purchasing his vehicle, he test drove it and spoke extensively with

19  a salesperson at the dealership. He had also seen Subaru television ads. He also

20  inspected the Subaru pre-owned window sticker before purchasing. Plaintiff

21  Merman believed that the Forester would be a safe and reliable vehicle. When

22  Plaintiff Merman purchased his vehicle, he was unaware that the vehicle's

23  windshield contained the Defect.

24     46.     Defendants' omissions were material to Plaintiff Merman. Had

25  Defendants disclosed their knowledge of the Defect before he purchased his

26  vehicle, Plaintiff Merman would have seen and been aware of the disclosures.

27  Furthermore, had he known of the Defect, Plaintiff Merman would not have

28  purchased his vehicle, or would have paid less for it.

47.     Specifically, on October 26 or 27, 2019, with approximately 23,000 miles on the odometer of his Subaru Forester, his life partner's daughter was driving the vehicle with his life partner in the car when a crack occurred in the top left corner of the windshield. Neither his life partner nor her daughter heard or saw any debris hit the windshield.  On October 28, 2019, he saw that the crack had spread from the top left corner of the windshield to the rear-view mirror area of the windshield.

48.     During the week of October 28, 2019, Plaintiff Merman took the vehicle to AutoNation Subaru West dealership to complain about the windshield crack and was told that his Subaru maintenance agreement did not cover windshield replacement, that the dealership does not replace windshields, and that he should have the windshield replaced at Safelite Auto Glass.

49.      On November 4, 2019, Plaintiff Merman took his vehicle to Safelite Auto Glass in Lakewood, Colorado where his cracked windshield was replaced with a new Subaru OEM windshield. The total cost of the replacement was $772, of which he paid $500.00 for the repair, which was the amount of his insurance deductible.

50.     Upon information and belief, the replacement windshield supplied by Subaru suffered from the same defect as the original windshield installed in Plaintiff Merman's Class Vehicle.

51.     On November 13, 2019, Plaintiff Merman took his vehicle, which had 25,638 miles at the time, to AutoNation Subaru West to recalibrate the "EyeSight® Driver Assist Technology" feature with his new windshield. The dealership charged him, and he paid, $220 for this recalibration.

52.     At all times, Plaintiff Merman, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**Defendant**

53.     Defendant Fuji Heavy Industries Ltd. ("Fuji" or "FHI") is a

Japanese corporation located at The Subaru Building, 1-7-2 Nishishinjuku, Shinjuku-ku, Tokyo, 160-8316, Japan. Defendant Fuji is responsible for the design, manufacturing, distribution, marketing, sales and service of Subaru vehicles, including the Vehicles, around the world, including in the United States.

54.     Defendant Subaru of America, Inc. ("SOA") is a New Jersey corporation with its principal place of business located in Cherry Hill, New Jersey.

55.     SOA is the U.S. sales and marketing subsidiary of Fuji and wholly owned subsidiary responsible for distribution, marketing, sales and service of Subaru vehicles in the United States.

56.     Fuji and SOA (collectively "Subaru") have common management. Indeed, SOA's sales, marketing and distribution efforts in the United States are headed by corporate officers of Fuji. For example, Takeshi Tacihmori, the chairman and CEO of SOA is also a Director and Corporate Executive Vice President for Fuji in charge of the Subaru Global Marketing Division, Subaru Japan Sales and Marketing Division and Subaru Overseas Sales and Marketing Divisions 1 and 2. The incoming Chairman of SOA is also a Corporate Senior Vice President of Fuji who is Chief General Manager of Subaru Overseas and the Vice President in charge of Sales and Marketing, Division 1.

57.     Upon information and belief, Defendant Fuji communicates with Defendant SOA concerning virtually all aspects of the Subaru products it distributes within the United States.

58.     Upon information and belief, the design, manufacture, distribution, service, repair, modification, installation and decisions regarding the engines within the Vehicles were performed exclusively by Defendants.

59.     Upon information and belief, Defendants develop the owner's manuals, warranty booklets, and information included in maintenance

1    recommendations and/or schedules (including the oil change intervals) for the

2    Vehicles.

3        60.    At all relevant times, Defendants were and are engaged in the

4    business of designing, manufacturing, constructing, assembling, marketing,

5    distributing, and/or selling automobiles and motor vehicle components in Los

6    Angeles County and throughout the United States of America.

7                         **JURISDICTION**

8        61.    This is a class action.

9        62.    Members of the proposed Class are citizens of states different from

10    the home state of Defendants.

11        63.    On information and belief, the aggregate claims of individual Class

12    Members exceed $5,000,000.00 in value, exclusive of interest and costs.

13        64.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

14                           **VENUE**

15        65.    Defendants, through their business of distributing, selling, and

16    leasing the Class Vehicles, has established sufficient contacts in this district such

17    that personal jurisdiction is appropriate.  Defendants are deemed to reside in this

18    district pursuant to 28 U.S.C. § 1391(a).

19        66.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)

20    because Plaintiff Armstrong resides in the County of Los Angeles, California. In

21    addition, Plaintiff Armstrong's Declaration, as required under California Civil

22    Code section 1780(d) but not pursuant to *Erie* and federal procedural rules,

23    reflects that a substantial part of the events or omissions giving rise to the claims

24    alleged herein occurred, or a substantial part of property that is the subject of this

25    action, is situated in Los Angeles County, California.  It is attached as Exhibit 1.

26                 **FACTUAL ALLEGATIONS**

27        67.    For years, Defendants have designed, manufactured, distributed,

28    sold, and leased the Class Vehicles. Defendants have sold, directly or indirectly,

through dealers and other retail outlets, thousands of Class Vehicles in California and nationwide. Defendants warrant and service the Class Vehicles through their nationwide network of authorized dealers and service providers.

68.    Defendants provided all purchasers and lessees of the Class Vehicles with a New Vehicle Limited Warranty (the "Warranty") with the purchase or lease of the Class Vehicles.

69.    The Warranty states in relevant part:

**2017 Warranty**
Below is a brief description of the Subaru Limited Warranty for 2017 model year Subaru vehicles that is provided to each buyer by Subaru at no additional charge. Your Subaru Dealer has complete details concerning the warranty and any exclusions and/or restrictions that may apply. Please visit your nearest Subaru Dealer for this further information. Click here for optional extended protection beyond the warranty.

**Who Makes These Warranties**
These warranties are made by SUBARU of America, Inc. ("SOA")[1], One Subaru Drive, P.O. Box 9103, Camden, NJ 08101.

**When These Warranties Apply**
These warranties only apply if the vehicle was imported or distributed by SOA and sold to the first retail purchaser by an Authorized SUBARU Retailer in the United States. Any and all repairs must be performed by an Authorized SUBARU Retailer located in the United States. Every owner of the vehicle during the warranty period shall be entitled to the benefits of these warranties. If the vehicle is sold or otherwise transferred, it is recommended and requested that the new owner promptly send written notice of the transfer of ownership to SOA at the address indicated above.

**Warranty Periods**
Warranty coverage begins on the date the vehicle is delivered to the first retail purchaser. If the vehicle was used as a demonstrator or company vehicle before being sold at retail, warranty coverage begins on the date the vehicle was first placed in such service.

**What is Covered**
These warranties cover any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use:

- In any part of the 2017 model year SUBARU which is identified on the inside front cover of this Warranty & Maintenance Booklet(the "vehicle").
- Any Genuine SUBARU Optional Accessories[2]
- In addition, adjustment services are covered one time only during the

first 36 months/36,000 miles of operation, whichever comes first.

**New Vehicle Limited Warranty**
BASIC COVERAGE is 3 years or 36,000 miles, whichever comes first.
Subject to the exclusions listed in this warranty, it covers the entire vehicle.

70.     The warranties and representations contained in the Warranty were and are material to Plaintiffs because Plaintiffs would not have purchased the Class Vehicle or would not have paid as much as they did if the windshield in his Class Vehicle were not covered by a full warranty.

71.     The Defect causes the Class Vehicles' front windshield to crack, chip and/or fracture for no reason at all and/or under circumstances that would not cause nondefective windshields to similarly fail. The Defect presents a safety hazard that renders the Class Vehicles unreasonably dangerous to consumers due to, *inter alia*, the impact of the Defect on driver visibility, driver distraction, and impairment of the EyeSight® safety system.

72.     Defendant issued Technical Service Bulletin (TSB) Number 12-192-15R on October 26, 2016, revised on November 19, 2016, that sets forth the same Defect as it existed in prior model years for two of the three Class Vehicles at issue here and states the known cause of the Defect in 2015-2016 Legacy and Outback models as follows: "Further investigation has determined the root cause for many of these failures to be the ceramic materials used for the black-colored printed perimeter combined with the silver-colored material used for the wiper deicer portion of the windshield glass." On information belief, this is at least one cause of the Defect in the Class Vehicles.

73.     Plaintiffs are informed and believe and based thereon allege that prior to the sale of the Class Vehicles, Defendants knew, or should have known, about the Defect through their exclusive knowledge of non-public, internal data about the Defect, including: pre-release testing data; early consumer complaints about the Defect to Defendants' dealers who are their agents for vehicle repairs; aggregate data from Defendants' dealers; consumer complaints to the NHTSA

1  and resulting notice from NHTSA; dealership repair orders; testing conducted in
2  response to owner or lessee complaints; and other internal sources of aggregate
3  information about the problem. Nevertheless, Defendants have actively
4  concealed and failed to disclose this defect to Plaintiffs and Class Members at
5  the time of purchase or lease and thereafter.

6  74.   Furthermore, on information and belief, when vehicles are brought
7  in for repair, Defendants' dealers refuse to replace the defective windshields
8  under warranty, often claiming that an impact caused the failure, notwithstanding
9  the fact that the customer witnessed no impact and/or that any impact was so
10  slight it should not have caused the windshield to fail. On information and belief,
11  Defendants' dealers' systematic denial of valid warranty claims is part of a
12  concerted effort orchestrated by Defendants to minimize the cost of warranty
13  claims.

14  75.   Moreover, on information and belief, when consumers have their
15  windshields repaired, their defective windshields are merely replaced with
16  similarly defective windshields, so that their Class Vehicles are not actually
17  repaired.

18  **The Defect Poses a Serious Safety Concern**

19  76.   The Defect is material to consumers because it presents a serious
20  safety concern. Class Members have repeatedly reported disturbing failures to
21  the National Highway Traffic Safety Administration ("NHTSA"). The following
22  are complaints reflecting the safety risk posed:

23  77.   On NHTSA's website where consumer complaints about 2017
24  Subaru Outbacks are posted,[3] the following incident posted on August 2, 2017
25  and dated July 27, 2017 was reported:

27  WINDOW CRACKED BUT WAS NOT HIT WITH
ANYTHING. CRACK APPEARED ON THE
28  DRIVERS SIDE, HALFWAY DOWN THE

[3]https://www.nhtsa.gov/vehicle/2017/SUBARU/OUTBACK/SW/AWD

WINDSHIELD, AND OBSTRUCTS VIEW OF THE DRIVER. CAR HAS LESS THAN 1600 MILES ON IT. DEALER STATED IT WAS NOT COVERED AS A DEFECT AND WE ARE ON OWN OWN TO REPLACE IT. THERE ARE NUMEROUS COMPLAINTS OF SUBARU OUTBACK WINDSHIELDS CRACKING BECAUSE THEY ARE TO THIN. DANGEROUS TO DRIVE DUE TO VISIBILITY ISSUES.

78.    On NHTSA's website where consumer complaints about 2018 Subaru Outbacks are posted,[4] the following incident posted on February 16, 2019 and dated February 16, 2019 was reported:

SECOND CRACKED WINDSHIELD IN ONE WEEK. FIRST ONE WAS REPLACED 2/8/18. BOTH TIMES TRAVELED AT LOW TO MODERATE SPEED 25-40 MPH ON LOCAL FWY IN LOS ANGELES, CA. SUNNY MILD, DRY CONDITIONS, NO WIND. SMALL PEBBLE HIT WINDSHIELD. COULDN'T SEE HIT, ONLY HEARD A SMALL CRACK SOUND. DAMAGED WINDSHIELD, FIRST TIME SMALL PEBBLE MARK GREW TO LONG CRACK. INITIAL IMPACT SIZE ABOUT 1.5 - 2 MM. ONE WEEK LATER ANOTHER PEBBLE HIT WINDSHIELD IN SLOW TRAFFIC,35 MPH, NO TRUCKS NEAR BY. SAME SIZE OF MARK. SUBARU REQUIRES THEIR WINDSHIELD REPAIR AT CUSTOMER COST OF $930. WARRANTY DOES NOT COVER ANY DEBRIS DAMAGE, BUT SMALL PEBBLES SHOULD NOT CAUSE THIS KIND OF DAMAGE AND COSTS. HAD A GRAND CHEROKEE 184K MILES AND NEVER A CRACK OR DING, NEVER ISSUE FOR OUR 2005 SAAB, OR ANY OREVIOUS VEHICLE. SHOULD NOT COST US $1860 MONTH ADDITIONAL TO MAINTAIN CAR, PLUS SAFETY ISSUE. ACCORDING TO SUBARU CORPORATE: DOES NOT RECOMMEND US TO DRIVE IT WITH I-SITE CAMERA WITH A DAMAGED WINDSHIELD. THEY SAY THAT THE GLASS IS THINNER/LIGHTER IN ORDER TO WORK WITH CAMERA AND BE MORE FUEL EFFICIENT/LIGHTER. CARS SHOULD BE ABLE TO WITHSTAND NORMAL DRIVING AND ROAD CONDITIONS.

79.    On NHTSA's website where consumer complaints about 2019

---

[4] https://www.nhtsa.gov/vehicle/2018/SUBARU/OUTBACK/SW/AWD (last viewed November 10, 2019).

CLASS ACTION COMPLAINT

1  Subaru Outbacks are posted,[5] the following incident posted on January 24, 2019

2  and dated January 7, 2019 was reported:

THE CAR WAS NOT USED OVER THE WEEKEND EXCEPT FOR A 5 MILE TRIP TO CHURCH WHERE IT DID NOT ENCOUNTER ANY ROCKS, HITS, ETC. DROVE HOME AND THE CAR WINDSHIELD WAS FIND. THE NEXT MORNING WHEN I GOT INTO THE CAR, AFTER I USED MY REMOTE TO START AND WARM UP MY OUTBACK, THERE WAS ABOUT AN 8-10 INCH CRACK IN THE WINDSHIELD THAT ORIGINATED FROM BEYOND THE WINDSHIELD WIPER ON THE PASSENGER SIDE OF THE CAR. THE CRACK GREW WORSE TO ABOUT 12 INCHES. CALLED SUBARU DEALER WHO DIRECTED ME TO THEIR WINDSHIELD SERVICE AGENT. TOOK TIME OFF FROM WORK AND THEY INSTALLED OEM GLASS (INSURANCE COVERS THIS) AND CALIBRATED THE WINDSHIELD. AFTER DRIVING HOME, THE CAR MADE WIND TUNNEL NOISES, WINDSHIELD FLUID SYSTEM DID NOT WORK, NAVIGATION DID NOT WORK SO I BROUGHT THE CAR TO THE DEALER (TOOK MORE TIME OFF FROM WORK). THEY FOUND A LEAK IN THE WINDSHIELD, REPAIRED THE FLUID UNIT AND IGNORED THE NAVIGATION ISSUE. THEY SENT ME BACK TO THEIR AGENT. THEY TOOK OUT THE WINDSHIELD REPOSITIONED IT AND SENT ME ON MY WAY. TODAY I FOUND PUDDLES OF WATER ON THE FLOOR OF MY CAR (LEAK), NAVIGATION DOES NOT WORK AND WIND TUNNEL NOISE IS STILL THERE. THIS WINDSHIELD IS SUPPOSED TO PROTECT THE DRIVER AND PASSENGER AS EXTRA SUPPORT FOR THE ROOF, PREVENTION OF OBJECTS FLYING AT YOU AND ALLOW FOR THE EYESIGHT SYSTEM TO DO ITS JOB. THIS CAR IS ONE MONTH OLD AND THE CRACK IN THE WINDSHIELD EXPERIENCE SOUNDS EERILY SIMILAR TO OTHERS' COMPLAINTS. WHEN YOU PAY THE MONEY FOR A TOP SAFETY PICK, YOU WANT THE SAFETY AND I DO NOT HAVE IT.

80.    On NHTSA's website where consumer complaints about 2017

Foresters are posted,[6] the following incident dated March 21, 2018 was reported:

---

[5] https://www.nhtsa.gov/vehicle/2019/SUBARU/OUTBACK/SW/AWD (last viewed November 10, 2019).

[6] https://www.nhtsa.gov/vehicle/2017/SUBARU/FORESTER/SUV/AWD

OWN A 2017 SUBARU FORESTER, WE HAVE LESS THAN 11,000 MILES AND LESS THAN ONE YEAR OF OWNERSHIP. A SMALL STONE HITTING THE WINDSHIELD, QUICKLY ENDS UP IN A 24" TO 30" LONG LINEAR CRACK UNLIKE MY OTHER TWO VEHICLES. WE ARE IN PROCESS OF REPLACING 3RD WINDSHIELD GLASS IN LESS THAN ONE YEAR. IT APPEARS THAT THERE MAY BE AN OEM DEFECT. THIS LONG CRACK CREATES DANGER VISION PROBLEM. EVERY WINDSHIELD REPLACEMENT REQUIRES RE-CALIBRATION OF EYESIGHT TOO. THIS IS AN ADDITIONAL BURDEN ON INSURANCE AS WELL AS OWNERS AND SHOULD BE ADDRESSED ASAP. MANUFACTURER HAS NOT YET ACKNOWLEDGE THE EXISTENCE OF DEFECTIVE WINDSHIELD. WE REQUEST THAT CONSUMER PRODUCT RECALL INVESTIGATE THIS ISSUE ASAP.

81. The Defect presents a safety concern because it impairs the driver's visibility, impairing the driver's ability to accurately see the road, signage, other vehicles, and potential road hazards. In addition, the cracks are visually distracting to the driver. Impaired visibility is unsafe at any time, particularly when combined with bright sunlight or hazardous weather conditions and when changing lanes, merging onto highways, making turns, and responding to hazards or changing conditions on the road.

**Defendants Had Superior and Exclusive Knowledge of the Defect**

82. Plaintiffs are informed and believe and based thereon allege that prior to the sale of the Class Vehicles, Defendants knew, or should have known, about the Defect through their exclusive knowledge of non-public, internal data about the Defect, including: pre-release testing data; early consumer complaints about the Defect to Defendants' dealers who are their agents for vehicle repairs; aggregate data from Defendants' dealers; consumer complaints to the NHTSA and resulting notice from NHTSA; dealership repair orders; testing conducted in response to owner or lessee complaints; Technical Service Bulletins issued for a cracked windshield defect on 2015-2016 Subaru Legacy and Outback models; and other internal sources of aggregate information about the problem.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### a.    *Numerous Consumer Complaints on the NHTSA Demonstrate That Defendants Aware of the Defect.*

83.    Federal law requires automakers like Defendants to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

84.    Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety-related. *Id.* Thus, Defendants knew or should have known of the many complaints about the Defect logged by NHTSA ODI. The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, Defendants to the Defect.

85.    With respect solely to the Class Vehicles, the following are but a few examples of the many complaints concerning the Defect which are available through NHTSA's website, www.safercar.gov. Many of the complaints reveal that Defendants, through their network of dealers and repair technicians, have been made aware of the Defect. In addition, the complaints indicate that despite having knowledge of the Defect and even armed with knowledge of the exact vehicles affected, Defendants often refused to diagnose the defect or otherwise attempt to repair it while Class Vehicles were still under warranty. When Defendants did attempt repairs, it merely replaced the windshields with similarly defective windshields.

86.    On NHTSA's website where consumer complaints about 2017

Subaru Outbacks are posted,[7] the following incident posted on December 20, 2016 and dated February 11, 2017 was reported:

> STAR CRACK IN WINDSHIELD DISCOVERED STATIONARY (IN CARPORT) THE DAY AFTER PURCHASING THE VEHICLE (ODOMETER READING 200 MILES). LOCATION OF CRACK SLIGHTLY ABOVE WIPER BLADE ON PASSENGER SIDE. IMPACT STRIKE THE SIZE OF A PINHEAD. THE DAMAGE IS CHARACTERISTIC OF PRIOR MODEL YEARS 2015 AND 2016 IN WHICH THE MANUFACTURER INITIATED RECALLS. IT IS APPARENT THIS PROBLEM CONTINUES AND HAS YET TO BE RESOLVED.

87.   On July 10, 2017 the following incident dated June 14, 2017 was reported:

> OUR WINDSHIELD BEGAN SLOWLY CRACKING STARTING AT THE BASE OF THE DRIVER SIDE FRONT WINDOW. IT BEGAN AT THE BOTTOM EDGE (HEAT STRIP) AND MOVED HALF UP THE WINDSHIELD BEFORE WE REPLACED. COST $569 FOR OEM WINDSHIELD. SUBARU DEALER DENIED THE WARRANTY CLAIM, WHILE ADMITTING A PROBLEM WITH EARLIER VERSIONS THAT YEAR'S OUTBACK.

88.   On August 2, 2017, the following incident dated July 27, 2017 was reported:

> WINDOW CRACKED BUT WAS NOT HIT WITH ANYTHING. CRACK APPEARED ON THE DRIVERS SIDE, HALFWAY DOWN THE WINDSHIELD, AND OBSTRUCTS VIEW OF THE DRIVER. CAR HAS LESS THAN 1600 MILES ON IT. DEALER STATED IT WAS NOT COVERED AS A DEFECT AND WE ARE ON OWN TO REPLACE IT. THERE ARE NUMEROUS COMPLAINTS OF SUBARU OUTBACK WINDSHIELDS CRACKING BECAUSE THEY ARE TO THIN. DANGEROUS TO DRIVE DUE TO VISIBILITY ISSUES.

89.   On October 5, 2017, the following incident dated September 28, 2017 was reported:

> PURCHASED A 2015 OUTBACK AND EXPERIENCED 4 CRACKED WINDSHIELDS IN AN

---

[7] https://www.nhtsa.gov/vehicle/2017/SUBARU/OUTBACK/SW/AWD

CLASS ACTION COMPLAINT

18 MONTH PERIOD. TRADED THE CAR IN FOR A 2017 OUTBACK HOPING THEY FIXED THE DESIGN FLAW. NOW 6 MONTHS AFTER 2017 OUTBACK PURCHASE AN OUTRAGEOUS CRACK FORMED ON THIS NEW VEHICLE. ALL 5 CRACKS BEGAN NOT FURTHER THAN 2 TO 3 INCHES FROM THE FRAME. SO 5 CRACKED WINDSHIELDS IN A 2 YEAR PERIOD FROM SUBARU OUTBACK.

AUTOMOBILES. THE DEALERSHIP AND MANUFACTURER NEVER WOULD ACKNOWLEDGE THAT THERE ARE SO MANY OTHER PEOPLE EXPERIENCING THIS PROBLEM. SOMETIMES THE CRACK WOULD APPEAR SPONTANEOUSLY, SOMETIMES IT ACTUALLY SOUNDED LIKE CRACKLING SOUNDS HAPPENING IN FRAME AND MAYBE (?) ONE TIME THERE MIGHT HAVE BEEN A SMALL PEBBLE HIT THE WINDSHIELD. TWICE I WASN'T EVEN DRIVING THE VEHICLE. IMPEDES VISION. DISTRACTS DRIVER.

90.     On October 19, 2017, the following incident dated October 17, 2017 was reported:

I VERY SMALL ROCK CHIP HIT MY WINDSHIELD INITIALLY CAUSING AN 8 INCH CRACK AND IS NOW OVER TWO FEET LONG. THE CHIP DID NOT EVEN LEAVE AN IMPACT MARK; IF YOU TRIED RIGHT NOW TO SEE WHERE THE CRACK STARTED YOU WOULD NOT BE ABLE TO. I REVIEWED FORUMS ONLINE AND HAVE SEEN NUMEROUS COMPLAINTS ABOUT OUTBACK WINDSHIELDS. WEAK OR CHEAP IS HOW THEY WERE OFTEN DESCRIBED. THIS WAS A VERY SMALL ROCK CHIP THAT HIT MY WINDSHIELD. THIS AMOUNT OF DAMAGE SHOULD NOT HAVE HAPPENED. I AGREE WITH THE FORUMS; WEAK AND CHEAP. I SEE THERE IS EVEN A CLASS ACTION LAWSUIT AGAINST SUBARU.

91.     On NHTSA's website where consumer complaints about 2018 Subaru Outbacks are posted,[8] the following incident posted on April 29, 2018 and dated April 28, 2018 was reported:

WINDSHIELD DEVELOPED CRACKED, LOWER MID AREA EXTENDED UPWARD ABOUT 12 INCHES. VEHICLE WAS STATIONARY, PARKED.

_____
[8] https://www.nhtsa.gov/vehicle/2018/SUBARU/OUTBACK/SW/AWD (last viewed November 10, 2019).

CLASS ACTION COMPLAINT

1

WAS NOT HIT BY ANY ROAD DEBRIS. NOTICED DEFECT WHEN STARTING CAR.

2

3

92.     On May 22, 2018, the following incident dated May 18, 2018 was reported:

4

5

WINDSHIELD EASILY CRACKS - WE HAVE HAD OUR 2018 OUTBACK FOR LESS THAN 6 MONTHS AND LESS THAN 5000 MILES AND HAVE HAD 3 WINDSHIELDS DEVELOP SEVERE CRACKING. THE FIRST TWO WERE REPLACED WITH FACTORY WINDSHIELDS BY PROFESSIONAL INSTALLERS. THE SLIGHTEST IMPACT, THE LAST TWO BEING BARELY PERCEIVABLE, RESULTS IN AN ELONGATED CRACK FORMING. WITH FOUR VEHICLES IN OUR HOUSEHOLD, WE HAVE ONLY HAD 2 WINDSHIELDS REPLACED IN 14 YEARS SINCE MOVING TO THIS AREA SO HAVE RULED OUT BAD LUCK OR DRIVING HABIT. SUBARU (BOTH DEALER AND CORPORATE) HAVE BEEN UNRESPONSIVE. THE CURRENT CRACKING AND STAR FORMED AFTER A BARELY AUDIBLE IMPACT. THE STAR GREW AND IS NOW CRUMBLING IN THE CENTER WITH 3 FRACTURE LINES EXTENDING FROM IT.

6

7

8

9

10

11

12

13

14

15

FIRST INCIDENT - ON I-17 WHILE PASSING A SEMI APPROX SPEED 75 MPH

16

SECOND INCIDENT - ON AZ 69 IN NORMAL TRAFFIC APPOX SPEED 45 MPH

17

18

THIRD INCIDENT - ON I-17 WHILE FOLLOWING A VEHICLE USING ISIGHT DYNAMIC CRUISE CONTROL APPROX SPEED 75 MPH

19

20

FIRST TWO CLAIMS COVERED BY INSURANCE WHICH WE ATTRIBUTED TO BAD LUCK. THIRD INCIDENT IN SO FEW MONTHS/MILES SEEMS TO POINT TO QUALITY/DESIGN ISSUE SINCE OTHER VEHICLES (PAST AND PRESENT) HAVE NEVER DEVELOPED THIS SEVERE CRACKING (PICTURE PROVIDED) WHICH PROMPTED THIS COMPLAINT.

21

22

23

24

93.     On July 26, 2018, the following incident dated July 11, 2018 was reported:

25

26

27

DRIVING INTERSTATE, 65MPH, SMALL OBJECT THROWN FROM ANOTHER VEHICLE HIT MY WINDSHIELD ON THE LEFT EDGE. SHORT CRACKS APPEARED IMMEDIATELY. TWO SPREAD ALL THE WAY TO THE REAR VIEW

28

1    MIRROR AREA WITHIN DAYS. VEHICLE IS ONLY
     TWO MONTHS OLD.

2

3        94.    On December 17, 2018, the following incident dated December 16,

4    2018 was reported:

5            MY WINDSHIELD IS CRACKED FOR THE 2ND
             TIME NOW IN ITS FIRST YEAR OF OWNERSHIP.
6            THE FIRST TIME IT CRACKED IT WAS BECAUSE
             OF A PEBBLE STRIKE FROM THE ROAD.
7            EXTREMELY SMALL FRAGMENT STRUCK THE
             GLASS, MADE A POCK MARK, AND THE
8            WINDSHIELD WAS REPLACED. TODAY, LESS
             THAN A MONTH LATER A NEW CRACK
9            APPEARED WHILE DRIVING WITHOUT ANY
             STRIKE FROM AN OBJECT. SUBARU DEALER
10           CLAIMS IT WAS STRUCK BUT FIND A CRACK
             ONLY WITHOUT ANY POINT ALONG IT OF AN
11           IMPACT MAKES ME VERY VERY SUSPICIOUS.
             NOW I HAVE TO WAIT FOR THE INSURANCE
12           COMPANY TO SETTLE ON CHARGES AND SEND
             A CHECK BEFORE THE NEXT WINDSHIELD CAN
13           BE APPLIED. MY WIFE AND I WERE CALMLY
             DRIVING ON COMPLETELY PAVED ROADS
14           WHEN WE BOTH WATCHED THE CRACK APPEAR
             AND GROW DURING OUR DRIVE. :-( I HAVE
15           DRIVEN FOR 50+ YEARS, AND OWNED 20+ CARS.
             I'VE NEVER HAD THIS HAPPEN.

16

17       95.    On December 21, 2018, the following incident dated December 20,

18   2018 was reported:

19           2 WINDSHIELD CRACKS IN LOWER PORTION OF
             WINDSHIELD DURING 1ST YEAR OF
20           OWNERSHIP. BOTH CRACKS OCCURRED WHILE
             DRIVING AROUND TOWN ~35 MPH, ONCE
21           DURING A 100 DEGF SUMMER DAY, AND THE
             OTHER DURING A 40 DEGF RAINY WINTER
22           MORNING. INSPECTION OF CRACK AFTER
             STOPPING SHOWED POSSIBLE ORIGINATION
23           FROM ~1MM CHIPS.

24           DURING THE SUMMER, THE FIRST CHIP,
             LOCATED IN THE DE-ICER AREA, GREW
25           RAPIDLY TO A CRACK ACROSS THE
             WINDSHIELD WITH A LOUD 'POP' SOUND AFTER
26           THE AIR CONDITIONER WAS TURNED ON HIGH
             USING DEFROSTER AIR MODE. SUBARU OF
27           AMERICA (NOT THE DEALER) REPLACED THE
             WINDSHIELD AND RECALIBRATED THE
28           EYESIGHT SYSTEM AS A 'GOODWILL' REPAIR.

             DURING THE WINTER, ANOTHER CHIP

BETWEEN THE VIN# DISPLAY WINDOW AND THE PERIMETER OF THE LOWER WINDSHIELD EXPLOSIVELY GREW TO A CRACK WHEN HEATED DEFROSTER AIR WAS ACTIVATED. REPAIR PENDING.

MAIN CONCERN IS THE FRAGILE NATURE AND TEMPERATURE DEPENDANCE OF THIS GLASS TEMPER, ESPECIALLY NEAR WINDOW BOUNDARY CONDITIONS AND WHERE DEFROSTER AIR IS THE STRONGEST.

OVER 20 YEARS OF DRIVING OTHER VEHICLES ON THE SAME ROUTE HAVE CAUSED LITTLE CHIPS ON OTHER WINDSHIELDS, BUT NEVER HAS A CHIP GROWN INTO A CRACK, WITH OR WITHOUT HOT OR COLD DEFROSTER AIR HITTING IT. I SUSPECT THAT THE THICKNESS AND TEMPER OF THE LATEST GENERATION OF OUTBACK CARLEX WINDSHIELDS WILL CONTINUE TO CAUSE ISSUES SIMILAR TO TSB# 12-192-15R.

96.    On January 17, 2019, the following incident dated January 17, 2019 was reported:

A TINY PEBBLE STRUCK THE WINDSHIELD ON THE INTERSTATE, BUT IT SUDDENLY GREW TO A CRACK APPROXIMATELY 6 INCHES LONG. NEVER HAD THIS PROBLEM BEFORE, AND MY CAR IS FAIRLY NEW ON THE ROAD (LESS THAN 8,000 MILES, BOUGHT IN JULY, 2018). DEEPLY CONCERNED THAT SUBARU STILL HAS NOT FIGURED OUT ITS NOTORIOUS WINDSHIELD-RELIABILITY PROBLEM THAT HAS FRUSTRATED SO MANY DRIVERS THROUGHOUT THE PAST 5 YEARS.

97.    On February 16, 2019, the following incident dated February 16, 2019 was reported:

SECOND CRACKED WINDSHIELD IN ONE WEEK. FIRST ONE WAS REPLACED 2/8/18. BOTH TIMES TRAVELED AT LOW TO MODERATE SPEED 25-40 MPH ON LOCAL FWY IN LOS ANGELES, CA. SUNNY MILD, DRY CONDITIONS, NO WIND. SMALL PEBBLE HIT WINDSHIELD. COULDN'T SEE HIT, ONLY HEARD A SMALL CRACK SOUND. DAMAGED WINDSHIELD, FIRST TIME SMALL PEBBLE MARK GREW TO LONG CRACK. INITIAL IMPACT SIZE ABOUT 1.5 - 2 MM. ONE WEEK LATER ANOTHER PEBBLE HIT WINDSHIELD IN SLOW TRAFFIC,35 MPH, NO TRUCKS NEAR BY.

1
2
3
4
5
6
7
8
9
10

> SAME SIZE OF MARK. SUBARU REQUIRES THEIR WINDSHIELD REPAIR AT CUSTOMER COST OF $930. WARRANTY DOES NOT COVER ANY DEBRIS DAMAGE, BUT SMALL PEBBLES SHOULD NOT CAUSE THIS KIND OF DAMAGE AND COSTS. HAD A GRAND CHEROKEE 184K MILES AND NEVER A CRACK OR DING, NEVER ISSUE FOR OUR 2005 SAAB, OR ANY OREVIOUS VEHICLE. SHOULD NOT COST US $1860 MONTH ADDITIONAL TO MAINTAIN CAR, PLUS SAFETY ISSUE. ACCORDING TO SUBARU CORPORATE: DOES NOT RECOMMEND US TO DRIVE IT WITH I-SITE CAMERA WITH A DAMAGED WINDSHIELD. THEY SAY THAT THE GLASS IS THINNER/LIGHTER IN ORDER TO WORK WITH CAMERA AND BE MORE FUEL EFFICIENT/LIGHTER. CARS SHOULD BE ABLE TO WITHSTAND NORMAL DRIVING AND ROAD CONDITIONS.

11
12
13

98.     On NHTSA's website where consumer complaints about 2019

Subaru Outbacks are posted,[9] the following incident posted on January 24, 2019

and dated January 7, 2019 was reported:

14
15
16
17
18
19
20
21
22
23
24
25
26
27

> THE CAR WAS NOT USED OVER THE WEEKEND EXCEPT FOR A 5 MILE TRIP TO CHURCH WHERE IT DID NOT ENCOUNTER ANY ROCKS, HITS, ETC. DROVE HOME AND THE CAR WINDSHIELD WAS FIND. THE NEXT MORNING WHEN I GOT INTO THE CAR, AFTER I USED MY REMOTE TO START AND WARM UP MY OUTBACK, THERE WAS ABOUT AN 8-10 INCH CRACK IN THE WINDSHIELD THAT ORIGINATED FROM BEYOND THE WINDSHIELD WIPER ON THE PASSENGER SIDE OF THE CAR. THE CRACK GREW WORSE TO ABOUT 12 INCHES. CALLED SUBARU DEALER WHO DIRECTED ME TO THEIR WINDSHIELD SERVICE AGENT. TOOK TIME OFF FROM WORK AND THEY INSTALLED OEM GLASS (INSURANCE COVERS THIS) AND CALIBRATED THE WINDSHIELD. AFTER DRIVING HOME, THE CAR MADE WIND TUNNEL NOISES, WINDSHIELD FLUID SYSTEM DID NOT WORK, NAVIGATION DID NOT WORK SO I BROUGHT THE CAR TO THE DEALER (TOOK MORE TIME OFF FROM WORK). THEY FOUND A LEAK IN THE WINDSHIELD, REPAIRED THE FLUID UNIT AND IGNORED THE NAVIGATION ISSUE. THEY SENT ME BACK TO THEIR AGENT. THEY TOOK OUT THE WINDSHIELD REPOSITIONED IT AND SENT ME ON MY WAY.

28

---

[9] https://www.nhtsa.gov/vehicle/2019/SUBARU/OUTBACK/SW/AWD (last viewed November 10, 2019).

TODAY I FOUND PUDDLES OF WATER ON THE FLOOR OF MY CAR (LEAK), NAVIGATION DOES NOT WORK AND WIND TUNNEL NOISE IS STILL THERE. THIS WINDSHIELD IS SUPPOSED TO PROTECT THE DRIVER AND PASSENGER AS EXTRA SUPPORT FOR THE ROOF, PREVENTION OF OBJECTS FLYING AT YOU AND ALLOW FOR THE EYESIGHT SYSTEM TO DO ITS JOB. THIS CAR IS ONE MONTH OLD AND THE CRACK IN THE WINDSHIELD EXPERIENCE SOUNDS EERILY SIMILAR TO OTHERS' COMPLAINTS. WHEN YOU PAY THE MONEY FOR A TOP SAFETY PICK, YOU WANT THE SAFETY AND I DO NOT HAVE IT.

99.   On January 11, 2019, the following incident dated February 15, 2019 was reported:

WINDSHIELD SPONTANEOUSLY CRACKED AT THE BASE OF THE WINDSHIELD, UNDER THE WIPER BLADE WHILE DRIVING ON THE HIGHWAY. I WAS NOT FOLLOWING ANY VEHICLES SO A ROCK CHIP COULD NOT BE THE CAUSE. THIS IS POOR WINDSHIELD QUALITY AND DESIGN BY SUBARU.

100.  On April 10, 2019, the following incident dated March 27, 2019 was reported:

ON TWO SEPARATE OCCASIONS, SOMETHING WAS KICKED UP AND HIT THE WINDSHIELD OF THE VEHICLE. BOTH TIME AN IMMEDIATE CRACK WAS SENT THROUGHT THE WINDSHIELD. BOTH TIMES WERE ON AN HIGHWAY, TRAVELING ABOUT 45MPH. I HAVE HAD THINGS POP UP AND HIT MY WINDSHIELD IN OTHER VEHICLES AND MAYBE THEY JUST CHILL OR STAR . I FEEL THERE IS A SIGNIFICANT DIFFERENCE IN THE STRENGTH OF THE GLASS THAT IS USED, IN THIS VEHICLE I FEEL IT IS EXTREMELY WEAK.

101.  On April 12, 2019, the following incident dated April 10, 2019 was reported:

ON 4/10/19 AS I WAS GETTING INTO MY CAR, I NOTICED A HUGE CRACK ON MY DRIVER SIDE OF THE WINDSHIELD THAT STARTS FROM THE BASE RUNNING TOWARD THE CENTER OF THE WINDSHIELD. THE CAR WAS BOUGHT ON JAN 20TH OF 2019 AND HAS 4200 MILES. CALLED

1

SAFELITE AND THEY ARE ESTIMATING $1300+
TO REPLACE.

2

3

102.   On April 19, 2019, the following incident dated April 17, 2019 was

4

reported:

5

MY CONCERN IS WITH THE QUALITY AND
SAFETY OF THE WINDSHIELD ON THE 2019
SUBARU OUTBACK. I PURCHASED A 2019
SUBARU OUTBACK ON 12/31/18. IT NOW HAS
3200 MILES ON IT. ON 04/17/19 I NOTICED AN 8-10
INCH CRACK IN THE WINDSHIELD. THERE WAS
A VERY SMALL, BARELY NOTICEABLE, CHIP
WITHIN THE CRACK. AT NO TIME DID I HEAR
ANYTHING HIT THE WINDSHIELD WHILE
DRIVING. THEREFORE, A CRACKED
WINDSHIELD WAS SHOCKING AND ENTIRELY
UNEXPECTED FROM SUCH MINIMAL CONTACT
WITH THE WINDSHIELD. WHEN THE CAR IS NOT
IN USE IT IS GARAGE KEPT. MY COMMUTE HAS
NOT CHANGED SINCE BUYING THIS CAR AND I
HAVE NEVER HAD A CAR WINDSHIELD CRACK
IN OVER 30 YEARS OF DRIVING. DUE TO THE
SIZE OF THE CRACK, THE ENTIRE WINDSHIELD
MUST BE REPLACED AND THE SUBARU
"EYESIGHT" SYSTEM RE-CALIBRATED. IT IS MY
OPINION THAT THE WINDSHIELD SHOULD NOT
HAVE CRACKED IN THIS SITUATION. A SIMPLE
GOOGLE SEARCH INDICATES THAT OTHERS
HAVE CONCERNS WITH THE 2019 SUBARU
OUTBACK WINDSHIELD.

6

7

8

9

10

11

12

13

14

15

16

17

18

103.   On NHTSA's website where consumer complaints about 2017

19

Subaru Foresters are posted,[10] the following incident posted on February 10,

20

2018 and dated January 26, 2018 was reported:

21

THE WINDSHIELD SPONTANEOUSLY CRACKED,
MIDDLE PASSENGER SIDE (NOT AWARE WHEN
IT HAPPENED. ONE TIME CAME OUT INTO THE
GARAGE AND NOTICED IT WAS CRACKED). IT
ALSO WAS SEVERELY CHIPPED ONE TIME
BEFORE (2500 MILES). SO IT HAS HAD TO BE
REPLACED 2 TIMES WITHIN 16,000 MILES AND
LESS THAN ONE YEAR OWNERSHIP.

22

23

24

25

26

104.   On February 22, 2018, the following incident dated February 12,

27

2018 was reported:

28

[10] https://www.nhtsa.gov/vehicle/2017/SUBARU/FORESTER/SUV/AWD
(last viewed November 10, 2019).

Page 27

WHILE DRIVING SUBARU FORESTER 2017, A
SMALL ROCK HIT THE WINDSHIELD AND
SMALL CRACK QUICKLY TURNED INTO 24" TO
30" LONG LINEAR CRACK AND AS A RESULT
ENDED UP REPLACING WIND SHIELD GLASS
AND RE-CALIBRATION OF EYESIGHT. THIS
HAPPENED TWICE IN LAST 8 MONTHS. IT
APPEARS TO BE AN OEM ISSUE. UNLIKE MY
OTHER TWO VEHICLES, THEY HAD SIMILAR
ISSUE HOWEVER THE CRACK WAS SHIELD BY
PROFESSIONALS AND NEVER DEVELOPED
LINEAR CRACK.

105. On March 21, 2018, the following incident dated March 21, 2018
was reported:

OWN A 2017 SUBARU FORESTER, WE HAVE LESS
THAN 11,000 MILES AND LESS THAN ONE YEAR
OF OWNERSHIP. A SMALL STONE HITTING THE
WINDSHIELD, QUICKLY ENDS UP IN A 24" TO 30"
LONG LINEAR CRACK UNLIKE MY OTHER TWO
VEHICLES. WE ARE IN PROCESS OF REPLACING
3RD WINDSHIELD GLASS IN LESS THAN ONE
YEAR. IT APPEARS THAT THERE MAY BE AN
OEM DEFECT. THIS LONG CRACK CREATES
DANGER VISION PROBLEM. EVERY
WINDSHIELD REPLACEMENT REQUIRES RE-
CALIBRATION OF EYESIGHT TOO. THIS IS AN
ADDITIONAL BURDEN ON INSURANCE AS WELL
AS OWNERS AND SHOULD BE ADDRESSED
ASAP. MANUFACTURER HAS NOT YET
ACKNOWLEDGE THE EXISTENCE OF
DEFECTIVE WINDSHIELD. WE REQUEST THAT
CONSUMER PRODUCT RECALL INVESTIGATE
THIS ISSUE ASAP.

106. On NHTSA's website where consumer complaints about 2018
Subaru Foresters are posted,[11] the following incident posted on September 7,
2018 and dated September 4, 2018 was reported:

WINDSHIELD CRACKED ALL THE WAY ACROSS
FROM THE TINIEST LITTLE DING FROM A ROCK.

107. On November 2, 2018, the following incident dated September 1,
2018 was reported:

THE WINDSHIELD SIMPLY CRACKED UNDER

---

[11] https://www.nhtsa.gov/vehicle/2018/SUBARU/FORESTER/SUV/AWD
(last viewed November 10, 2019).

THE PASSENGER WIPER AND QUICKLY SPREAD ACROSS THE WINDSHIELD. THERE WAS NO VIABLE IMPACT AND IT APPEARED OVERNIGHT. THIS HAPPENED IN EARLY SEPTEMBER AND WE ARE STILL WAITING FOR AN OEM REPLACEMENT FROM SUBARU.

108.   On March 17, 2019, the following incident dated December 21, 2018 was reported:

I PURCHASED THIS CAR 7/31/18. ON 12/21/18 (ODOMETER 3,427 MILES), THE FIRST MORNING WITH A HARD FROST, I FOUND THAT MY 2018 SUBARU FORESTER (STATIONARY AND PARKED IN MY DRIVEWAY) HAD DEVELOPED A CRACK OVERNIGHT FROM THE LOWER LEFT CORNER OF THE DRIVER'S SIDE UPWARD. (NO CRACK THE DAY BEFORE) I DROVE THE CAR 3 MILES TO WORK, CALLED THE DEALERSHIP WHERE I PURCHASED IT, AND SCHEDULED A SERVICE MANAGER EVALUATION APPOINTMENT THAT MORNING. I DROVE 12 MORE MILES TO THE DEALERSHIP. IN UNDER 3 HOURS, DRIVING TOTAL 15 MILES, SINCE DISCOVERING THE CRACK AND ARRIVING AT THE DEALERSHIP, THE CRACK HAD PROGRESSED UP AND ACROSS THE DRIVER'S SIDE OF THE WINDSHIELD. THE SERVICE MANAGER AGREED TO REPLACE THE WINDSHIELD AT NO COST TO ME, "AS A ONE-TIME GOOD WILL GESTURE". HE POINTED TO THE BASE OF THE CRACK WHICH BEGAN AT THE BOTTOM OF THE BLACK AREA BORDERING THE BASE OF THE WINDSHIELD, CLAIMED HE COULD SEE A CHIP, AND DUG HIS PEN INTO THE GLASS TO ENLARGE THE CRACK. TO ME, THIS ARE LOOKED MORE A FLAW IN THE GLASS WHERE BROKEN WINDSHIELD MAY HAVE HAD A FLAW HAD FLEXED DUE TO THE FREEZING WEATHER. HE DESCRIBED THE DAMAGE AS A CHIP ON MY REPAIR TICKET, WHICH IS MISLEADING IF AN ANALYSIS IS DONE ON THE CRACK, BUT IT SUPPORTS THE TICKET'S NOTE THAT THIS WAS A 1-TIME REPAIR AT NO CHARGE, WITH NO GUARANTEE OF FUTURE SIMILAR REPAIRS. THE DEALER DELAYED THE REPAIR DUE TO CHRISTMAS, AND THE CRACK CONTINUED TO PROGRESS ACROSS THE WINDSHIELD. REPLACEMENT INSTALLATION SCHEDULED FOR 12/26/18. ARRIVING FOR MY APPOINTMENT I WAS TOLD THE WINDSHIELD WAS ORDERED BUT THE DEALER FAILED TO SCHEDULE AN INSTALLER. THEY KEPT MY CAR UNTIL THE REPAIR WAS COMPLETED ON 12/28/19. THEY PROVIDED A LOANER CAR.

1
2
3

RESEARCHING SUBARU WINDSHIELD CRACKS ONLINE, I LEARNED THAT SUBARU WINDSHIELDS HAVE A PROBLEM WITH SPONTANEOUSLY CRACKING, BEGINNING WITH A 2016 OUTBACK RECALL, BUT FORESTER OWNERS ALSO ARE REPORTING CRACKS.

4
5

109.   On March 18, 2019, the following incident dated March 13, 2019

6

was reported:

7
8
9

OUR WINDSHIELD CRACKED SPONTANEOUSLY, STARTING AT THE WIPER PARK HEATER ON THE DRIVER SIDE. THE CAR WAS PARKED IN A PARKING GARAGE WHEN THE CRACK SPONTANEOUSLY APPEARED.

10

110.   On NHTSA's website where consumer complaints about 2019

11

Subaru Foresters are posted,[12] the following incident posted on February 5, 2019

12

and dated January 31, 2019 was reported:

13
14
15
16
17
18

I AM HERE TO REPORT MY 2019 SUBARU FORRESTER WINDSHIELD CRACK. I THE CAR IS ONLY 1 MONTH OLD AND WE FOUND THE CRACK IN THE MORNING WHILE SITTING IN THE DRIVEWAY I HEARD THE SAME PROBLEM HAPPENS ON 2015 OUTBACK I CALLED THE SHOP AND THEY TOOK PICTURES AND THEY DID NOT FIND ANY CHIPS THAT WOULD INDICATE A ROCK OR PEBBLE HIT THE CAR AND SAID THEY WILL CALL SUBARU AND GET BACK TO ME

19
20

111.   On March 8, 2019, the following incident dated February 13, 2019

21

was reported:

22
23
24
25

WINDSHIELD CRACKED FOR NO REASON NOTHING HIT IT WENT TO DEALER NO HELP FROM THEM TOOK CAR TO GLASS EXPERT . SAID WINDSHIELD WAS NOT HIT (SPONTANEOUS CRACK) HAPPENS ON 02/13/2019 FOUND OUT NO REPLACEMENT IN THE USA. WINDOW OUT OF CAR 02/26/2019)SUBARU NO HELP LEFT WITHOUT CAR

26
27

112.   On March 13, 2019, the following incident dated March 12, 2019

28

---

[12] https://www.nhtsa.gov/vehicle/2019/SUBARU/FORESTER/SUV/AWD (last viewed November 10, 2019).

CLASS ACTION COMPLAINT

1   was reported:

2       WHILE DRIVING ON THE FREEWAY, THERE
3       WERE SOME BUMPS ON THE ROAD AND
        SUDDENLY A CRACKLING NOISE AND A
4       VERTICAL CRACK DEVELOPED ON THE DRIVER
        SIDE WINDSHIELD. THE CRACKED RUN FROM
5       THE UPPER RIGHT CORNER TOWARDS THE
        BOTTOM OF THE WINDSHILED.
6
7   113.   On March 14, 2019, the following incident dated January 1, 2019

    was reported:
8
9       WINDSHIELD CRACK AND ROCK CHIP. THE
        SUBARU OEM WINDSHIELD IS VERY WEAK AND
10      I'VE ALREADY NOTICED A CHIP ON THE
        WINDSHIELD FOR A CAR THAT IS 5 MONTHS
11      OLD. SEVERAL OWNERS HAVE ALREADY FILED
        A COMPLAINT FOR THE PREVIOUS YEARS, AND
12      ITS THE SAME FOR 2019 AS WELL.

13  114.   On March 15, 2019, the following incident dated January 5, 2019

14  was reported:

15      BOUGHT THE CAR 11/23/2018, AND IN JANUARY
        2019 THE WINDSHIELD CRACK FROM THE
16      BOTTOM UP AND BRANCH OUT FOR NO
        REASON. THE CAR PARKED INSIDE OF OUR
17      GARAGE. CONTACTED SUBARU HQ AND
        DEALERSHIP SUBARU OF ONTARIO
18      CALIFORNIA, BOTH DENIED THE WINDSHIELD
        HAS ANY DEFECT. AND THE DEALERSHIP
19      SERVICE MANAGER ONLY LOOKED AT IT 2
        SECONDS AND SAID IT'S IMPACTED!!
20

21  115.   On April 1, 2019, the following incident dated April 1, 2019 was

22  reported:

23      THE FORESTER ARRIVED TO US FROM THE
        DEALERSHIP WITH A CRACKED WINDSHIELD.
24      IT WAS REPLACED BY THE DEALERSHIP. THE
        REPLACEMENT WAS CRACKED WITHIN A DAY
25      OF DRIVING THE VEHICLE. THERE SEEMS TO BE
        AN ONGOING ISSUE WITH THE 2019 SUBARU
26      FORESTER WINDSHIELDS. BOTH TIMES OF
        INCIDENT THE VEHICLE WAS IN MOTION ON
27      THE HIGHWAY AND WAS IMPACTED BY A VERY
        SMALL ROCK - YET THE ENTIRE WINDSHIELD
28      BECAME DAMAGED.

1
2
3

116.   On NHTSA's website where consumer complaints about 2017 Subaru Legacies are posted,[13] the following incident posted on July 6, 2017 and dated July 6, 2017 was reported:

4

       HELLO,

5
6
7
8
9
10
11
12

       I HAVE NOTICED AN ISSUE WITH 2017 SUBARU LEGACY WINDSHEILDS. WHEN THE OUTSIDE TEMPERATURE IS ABOVE 88°F AND THE "AUTO" CLIMATE CONTROL IS SET TO 68°C THE DIFFERENCE IN THE TEMPERATURE BETWEEN THE OUTSIDE AIR, AND THE COOLING INSIDE AIR DRAMATICALLY INCREASES THE WEAKNESS AND BRITTLENESS OF THE WINDSHEILD, SUCH THAT WHEN SOMETHING HITS IT, IT ALMOST INSTANTANEOUSLY CRACKS MORE THAN 7-8 INCHES IN LENGTH. I AM NIW HAVING MY SECOND WINDSHEILD REPLACED IN THE LAST 2 MONTHS BECAUSE OF THIS ISSUE.

13
14
15
16

       BOTH TIMES I WAS DOING ABOUT 70MI/HR ON I-94...I KNOW WINDSHEILDS CRACK WHEN SOMETHING HITS THEM, BUT THIS WAS DIFFERENT THE STRIKE WAS BARELY NOTICEABLE, SOMETHING THAT IF CONDITIONS WERE COOLER OR THE TEMPERATURE EQUALIZED, I DONT THINK THE THERMODYNAMICS WOULD BE RIGHT FOR.

17

       ****

18
19
20

117.   On June 12, 2018, the following incident dated June 12, 2018 was reported:

21
22
23
24
25
26
27

       NEW 2017 SUBARU LEGACY WAS BOUGHT IN MAY 2017. WITH IN A MONTH, WINDSHIELD CRACKED WHEN THE CAR WAS STATIONARY IN A SHOPPING MALL PARKING LOT. DEALER DID NOT COVER STATING IT WAS ROCK HIT. IT GOT FIXED WITH INSURANCE CLAIM. AFTER FIXING IT, THE SAME DAY EVENING IN THE OFFICE PARKING LOT, IT CRACKED AT THE SAME SPOT. WITH COURTESY OF THE THE REPAIRER IT WAS CHANGED WITH WARRANTY. NOW, EXACTLY AFTER ONE YEAR, WHILE DRIVING ON THE HIGHWAY, HEARD LOUD NOISE AS IF MY TIRE GOT BURST. WHILE LOOK AROUND I SAW THE WINDSHIELD CRACK AT THE SAME SPOT. IT

28

     [13]https://www.nhtsa.gov/vehicle/2017/SUBARU/LEGACY/4%252520DR/AWD (last viewed November 14, 2019).

1  CAN NOT BE COINCIDENT TO HAPPEN 3 CRACKS
   AT THE SAME SPOT.

2

3    118.   On NHTSA's website where consumer complaints about 2018

Subaru Legacies are posted,[14] the following incident posted on April 4, 2019 and

4

dated March 25, 2019 was reported:

5

6            THE   SUBARU   LEGACY   WINDSHIELD   IS
             EXTREMELY BRITTLE, SMALL SALT DEBRIS
7            CAUSED THE WINDSHIELD TO HAVE SEVERAL
             CHIPS ALL OVER THE WINDSHIELD, IN ALL MY
8            YEARS I'VE NEVER SEEN WINDSHIELDS BEING
             THIS  BRITTLE.  THERE  ARE  THOUSANDS  OF
9            COMPLAINTS  ON  SUBARU  FORUMS  ABOUT
             WINDSHIELDS  THAT  HAVE  THE  EYESIGHT
10           EQUIPPED   THAT   THEY   ARE   PRONE   TO
             CRACKING AND CHIPPING EASILY. RECENTLY
11           SUBARU  LOST  A  LAWSUIT  ABOUT  THEIR
             WINDSHIELD CRACKING ON THE 2015 AND 2016
12           SUBARU OUTBACKS, I BELIEVE SUBARU HAS
             NOT ADDRESSED THIS ISSUE YET.

13           WHILE I WAS DRIVING ON THE HIGHWAY ON
             MY  WAY  TO  VACAVILLE  CALIFORNIA  MY
14           WINDSHIELD  ENDED  UP  WITH  AT  LEAST
             DOZENS OF CHIPS ALL OVER MY WINDSHIELD.
15           THIS IS UNACCEPTABLE BECAUSE I'VE MADE
             THIS TRIP COUNTLESS AMOUNT OF TIMES ON
16           MY OLD CAR AND NEVER HAD THIS ISSUE.

17

18   119.   On NHTSA's website where consumer complaints about 2019

Subaru Legacies are posted,[15] the following incident posted on November 7,

19

2018 and dated November 4, 2018 was reported:

20

21           MY  CAR  IS  2  WEEKS  OLD.  I  USED  THE
             DEFROSTER  ON  SATURDAY  NIGHT  AND  ON
22           SUNDAY MORNING THERE WAS A CRACK ON
             MY WINDSHIELD FROM THE BOTTOM CENTER.
23           UP AND TO THE PASSENGER'S SIDE. I DO NOT
             HEAR A STONE HIT MY WINDSHIELD WHILE
24           DRIVING. SUBARU SAID IT WAS A STONE AND
             IS CHARGING ME OVER $700.00 TO REPLACE IT.
25           I HAVE BEEN DRIVING FOR MANY YEARS AND
             HAVE NEVER GOTTEN A CRACK LIKE THIS. I
26           BELIEVE  IT  IS  A  FAULTY  WINDSHIELD  THAT

27    [14]https://www.nhtsa.gov/vehicle/2018/SUBARU/LEGACY/4%252520DR/
     AWD (last viewed November 14, 2019).
28    [15]https://www.nhtsa.gov/vehicle/2019/SUBARU/LEGACY/4%252520DR/
     AWD (last viewed November 14, 2019).

1

CRACKED       WITH       THE       CHANGE       IN
TEMPERATURE.

2

3

120.   On November 27, 2018, the following incident dated November 23,

4

2018 was reported:

5

THE VEHICLE IS LESS THAN ONE MONTH OLD
AND IT WAS FOUND ONE MORNING WITH AN 8
INCH CRACK IN THE WINDSHIELD. THERE WAS
NO IMPACT MADE ON THE WINDSHIELD. THE
CRACK IS COMING FROM THE BOTTOM LEFT
CORNER AND GOES TOWARDS THE CENTER.

6

7

8

**Customer Complaints on Third-Party Websites**

9

121.   Consumers similarly complained about the defect on various online

10

forums. Below are some examples.

11

122.   In a forum for 2017 Subaru Outbacks titled "Cracked Windshield"[16]

12

on carcomplaints.com, consumers posted as follows:

13

a.  A consumer wrote on December 14, 2016:

14

This crack appeared suddenly on the lower right side
(passenger side) of windshield of my 2017 Subaru
Outback, and could be observed actually spreading
toward the lower center after just having left my garage
3 or 4 minutes earlier into a snow storm.

15

16

17

There had been no sound of any impact on the vehicle
since leaving the garage.

18

19

Upon close inspection of the cracked windshield there
appeared to be a tiny ding in the midst of the crack. I was
not aware of any prior impact of any hard objeggglct to
this windshield.

20

21

22

I am disturbed about how a tiny (less than centimeter)
ding could result in a crack that resulted in need for
windshield replacement so soon after purchasing (3000
miles) the car. I am also unaware of any warranty with
Subaru that would have covered the cost of replacement.
A claim was made to my auto insurance. My windshield
was replaced.

23

24

25

26

Please see complaints of further windshield damages
requiring repairs, and a current crack to the replacement
windshield which has not yet been repaired (probably

27

28

[16]https://www.carcomplaints.com/Subaru/Outback/2017/windows_windshi
eld/cracked_windshield.shtml (last viewed November 13, 2019).

1

will require another replacement).

2

b.  Another consumer wrote on July 26, 2019:

3

4

5

6

7

8

9

While driving down the highway July 2017, a very small rock hit within bottom 2 inches (near the center) of the windshield that over the course of a few days grew. Took it in and due to the eye sight re-calibration had to pay $1600.00 to have it repaired by the dealer. This past week, with a bump of my hand on the front windshield it cracked again! Seriously, hitting with window with my bare hand, with little force SHOULD NEVER CAUSE THE WINDOW TO CRACK. My insurance deducible is $1,000 so hardly worth reporting it. The cost to replace is exorbitant. After doing some research online I find that that easily cracked wind shields are a common problem. I can't keep replacing my windshield at $1,600 a pop!

10

11

12

123.   In a forum for 2018 Subaru Outbacks titled "Windshield Cracks Easily"[17] on carcomplaints.com, consumers posted as follows:

13

a.  A consumer wrote on May 13, 2018:

14

15

16

Our Subaru was about 2 weeks old when while on a drive on a paved highway a crack suddenly appeared on passenger side of windshield. We had not experienced any indication of getting hit by a rock, etc. It seemed to come from the edge and extended in a curved pattern about 8 inches. The crack grew to about 12 inches.

17

18

19

20

21

22

Went to local Subatu dealer in Rapid City, SD the next day. The service tech traced the crack with a ball point pen and found a "star" indicating a rock chip very near the side edge of the windshield where the crack appeared to start. Since they don't replace windshields at their dealership they referred us to the local Safelite shop. They confirmed that it was a rock chip & replaced the windshield with what they told us was am OEM Subaru windshield. Since the car has "Eyesight" potentially it may have had to be recalibrated, but in our case it did not, which saved us a few hundred $$.

23

24

25

26

Incidentally, within one week of the windshield replacement we had a known rock hit the windshield while driving on a paved highway when we met a pickup truck and saw & heard the rock hit. It left a chip which we had repaired by the same Safelite shop the following day.

27

b.  Another consumer wrote on May 17, 2018:

28

[17]https://www.carcomplaints.com/Subaru/Outback/2018/windows_windshield/windshield_cracks_easily.shtml (last viewed November 13, 2019).

I know on the first event of the windshield cracking, a pebble hit in while on the highway. We had it back for 7 days when it happened again, got it back last Friday and it happened again (today is Thursday 5/17). I know the dealer claims a pebble hit it the second time, and I am sure they will this time. I cannot imagine how a pebble can cause this, been driving many years and have noted this happen previous and have had many pebbles hit my windshields over the years. I suspect faulty glass, I shared that with the dealer but no success. I will examine options under Virginia's Lemon law. Each time this occurs it takes the car away for 2 days as with all the technology the windshield must be calibrated as well.

c.  Another consumer wrote on June 1, 2018:

I had just drove off the lot and not 24 hrs. past brand new, got hit by a small rock...I thought it was a bug didn't even flinch and then a little thud afterwards 3 mins....crack appeared to move all the way across my vision. 12 inches immediately.

d.  Another consumer wrote on July 22, 2018:

This is my second Subaru in 1 year. My 2017 was totaled by hail (all the windows were knocked out). We were driving on the highway, and we got hit with a small rock. It hit right at the bottom, and it instantly started to crack. Within 30 seconds, it grew to well over 12 inches. It was a very small rock, that should've only been a starburst of a ding, and easily fixed. My 2017, had the exact same crack before it was totaled out from hail. I actually had a pending insurance claim to get the windshield fixed because they cost around $600-$700 to replace.

The car has less then 500 miles and I already have to get the windshield replaced. I read there was a pending lawsuit on other Outback years, and obviously, nothing has changed. I even have the windshield coverage for the outback, but it only covers dings, not large cracks. Didn't even stand a chance.

e.  Another consumer wrote on September 18, 2018:

I am here to report my 2018 Subaru Outback windshield crack. I heard the same problem happens on 2015 Outback (I owned one before). So I found the document from Internet, Subaru 12-192-15R, about extend warranty for 2015 windshield. I took the file to a Subaru shop, they just refused 2018 has the same problem - no same warranty. Now I don't know what to do.

124.   In a forum for 2018 Subaru Outbacks titled "Cracked Windshield"[18] on carcomplaints.com, consumers posted as follows:

a.  A consumer wrote on December 27, 2018:

I had replaced my first windshield within 48 hrs of driving the car off the lot brand new....not even a year old now and another crack has appeared. I am going to replace it with an independent dealer without using Subaru's Abra who over charged me exorbitantly... $313.45 which was supposedly just 50% of the total told to me by Subaru). Abra didn't give me any warranty and says needs to be replaced at full cost to me.

Again...hard to see if a rock hit it, it was raining and cold outside on the highway...didn't hear a rock again.

b.  Another consumer wrote on April 19, 2019:

I have a spontaneous crack in my windshield, driver's side, starting in the upper left hand of the front windshield and going diagonally to my eyesight line, then the crack continues horizontally. Both legs of the crack are at least 6-7 inches in length. The crack happened while stored in my garage for the night. No stones or rocks hit my windshield before the crack. I went to drive it the next morning and there it was.

There was a class action lawsuit against Subaru for faulty windshields that would crack for no reason on the 2015-2016 Outback & Legacy models. I think this problem is still happening.

****

c.  Another consumer wrote on April 29, 2019:

Windshield cracked just sitting at work parking lot. Staring from the frame on the driver side small fine S curve at first about 20" but couple days later expanding halfway across the glass. Called the dealer and it is clear that they are well aware of the problem and referred me to a designated person handling just windshields. Being very careful with her instruction basically assuming no responsibility unless you have some kind of "extension" on your warranty. Basically instructing me to Subaru America. She did way to bring the car to the dealer so they can determine the cause. I am not sure what are their methods and what they can determine. Possibly just collecting data so they Subaru can address this with their

[18] https://www.carcomplaints.com/Subaru/Outback/2018/windows_windshield/cracked_windshield.shtml (last viewed November 13, 2019).

glass supplier. Cost estimated at $2000. This is clearly not an isolated incident and I hope that there is a class action suit on the way to address this issue. Very frustrating and expansive repair. I currently own two and this is my third Subaru and possibly last.

125.   In a forum for 2019 Subaru Outbacks titled "Windshield Crack"[19] on carcomplaints.com, consumers posted as follows:

a.   A consumer wrote on November 24, 2018:

Returning from Rochester and a crack appears in the corner of the windshield by the passenger about 4-5 inches long. The next morning it's like 18 inches. There is no ding, no star, no full moon or half moon. I will update after I take it to a dealer.

b.   Another consumer wrote on January 11, 2019:

I am writing to express my concern regarding the quality of the Subaru Outback windshield. On December 21, 2018 I purchased my first Subaru. On January 11,2019 my windshield spontaneously cracked below the wipers and spread very quickly. Because it was obstructing my view I had to have the entire windshield replaced.

On February 15,2019, four days after the windshield was replaced, I received a rock chip that immediately cracked to a size larger than a dollar bill, beyond repair. I had expected better from the Subaru brand. I decided to purchase a Subaru Outback for the quality and reliability however after experiencing the poor windshield quality, I may not purchase another Subaru.

For a little background, I have had the same commute for over ten years. With other vehicles I have experienced rock chips, which I have been able to get repaired and never had to replace the windshield. I have driven lesser quality and less reliable vehicles and have never had to incur the out of pocket cost that I have with the Subaru Outback with 3 months of ownership.

To put this in perspective, the cost of one windshield replacement equals the cost of one month of daycare for a toddler, one year of auto and homeowner's insurance or two Epi Pens. This expense goes far beyond the annual routine maintenance I expect to pay on any vehicle.

c.   Another consumer wrote on April 10, 2019:

_____

[19]https://www.carcomplaints.com/Subaru/Outback/2019/windows_windshield/windshield_crack.shtml (last viewed November 13, 2019).

On Jan 20th 2019, purchased a brand new 2019 Subaru Outback 3.6R. The car is garaged inside everyday on 4/10/2019 I noticed a huge crack on front of my driver side windshield as I was getting into my car after work. I researched and on the Youtube I also see a video with exact crack that starts from the bottom of the windshield the person who posted the video had 2018 Outback. I've had Volvo, Honda and Acura MDX and never had I a window crack like this before even with little chip that would occur from driving highways or going off road on a ski trip.

d.  Another consumer wrote on May 29, 2019:

2019 Subaru Outback purchased February 2019 with 7500 miles. Windshield crack developed on the passenger side edge, 1/2 up and grew toward the center. The vehicle has eyesight and that will need to be re-calibrated after the replacement. One estimate is up to $1500 including calibration. Subaru doesn't want to know anything. Funny how our 2005 Sienna has 263,000 miles and the original windshield.

126.   In a forum for 2017 Subaru Foresters titled "Windshield Cracks"[20] on carcomplaints.com, a consumer wrote on March 5, 2018:

My windshield cracked with no apparent impact about 6 months ago. Then the other day, my husband noticed 4 new cracks appearing in my new windshield. He was upset because I had just been in a Fuller's Car Wash and he said those cloth car washes are too rough for this car. I knew there was no way that car's windshield was damaged in the car wash. We had to have the windshield replaced again! This car was purchased brand new, and this should not be happening. I just want a glass that won't crack.

127.   In a forum for 2018 Subaru Foresters titled "Cracked Windshield"[21] on carcomplaints.com, consumers posted as follows:

a.  A consumer wrote on August 25, 2018:

A small stone cracked my windshield on 8/25/2018, and the crack continues to grow while not even driving the vehicle. I live in Massachusetts where it is illegal to drive a car with a cracked windshield. The glass company told

[20]https://www.carcomplaints.com/Subaru/Forester/2017/windows_windshield/windshield_cracks.shtml (last viewed November 14, 2019).
[21]https://www.carcomplaints.com/Subaru/Forester/2018/windows_windshield/cracked_windshield.shtml (last viewed November 13, 2019).

CLASS ACTION COMPLAINT

me that the part is on backorder from Subaru (verified with a second glass company) and will not be available before the beginning of October. This means that I will not be able to operate my car for at least 5 weeks.

I have tried to get the dealer where I purchased the car to give me a loaner, but so far no luck. I talked to someone at Subaru Customer Service about this issue and am waiting to see for a response. I have also been in touch with the Massachusetts Attorney General's Office (They just talked about the lemon law here.) and a local TV station's consumer complaint division (They suggested writing to the head of Subaru USA -- I plant to do this next.)

There was a class action suit for windshield issues for earlier years Outbacks and Legacys,

b.  Another consumer wrote on December 10, 2018:

Add my wife and I to the list of disgruntled Subaru owners. Our 2018 Outback suffered a spontaneous windshield crack, without impact to the glass, originating in the deicer area on the driver's side (like countless others reported online). At least three separate service bulletins have been issued related to this problem, and a class action lawsuit is underway in California. We purchased the extended bumper-to-bumper warranty, but after speaking with a service center rep who says she's aware of the issue but can't remember the dealership ever covering a warranty claim for windshield damage, I have little faith this will be resolved satisfactorily.

128.   In a forum for 2017 Subaru Legacies titled "Cracked Windshield"[22] on carcomplaints.com, consumers posted as follows:

a.  A consumer wrote on March 30, 2018:

Few months after buying the vehicle, windshield cracks while driving on the highway. No apparent reason was heard or noticed. Insurance paid for the replacement minus the deductible.

b.  Another consumer wrote on June 12, 2018:

New car purchased in May 2017 and first windshield crack happen in June 2017 at shopping parking lot parked car. After fixing it with the Subaru parts, same day evening at the office parking lot it cracked again at

---

[22]https://www.carcomplaints.com/Subaru/Legacy/2017/windows_windshield/cracked_windshield.shtml (last viewed November 14, 2019).

CLASS ACTION COMPLAINT

the same spot. Non in June 2018 again another crack at the same spot. It can not be coincident to happen at the same spot for times.

129.   In a forum titled "Windshield cracked, 3 day old 2017 Limited"[23] on subaruoutback.org, a consumer with the username "davidaug" wrote regarding his 2017 Outback on January 1, 2017:

> Hi - new Subaru owner, bought the car last Saturday and Wednesday there developed a crack starting at the bottom of the center of the windshield, radiating upward. Turned on defroster and watched the crack start going laterally toward the driver side. There is a small chip about 1" above the start of the crack, but I do not recall hearing an impact. I previously drove a 1998 Mercedes Wagon for 290000 miles with many stone impacts, etc, but never any sort of crack resulted, the most damage was a small chip. So, I guess this is my question - is the 2017 also affected by previous model years windshield issues, or am I just the victim of bad luck (as the dealer service manager says)?

130.   A consumer with the username "jeffoutback" responded on this thread on October 25, 2017:

> Apparently we're in the same boat

> 2017 Subaru outback 15000 miles - long crack going up from a "tiny" impact to windshield a few inches from the bottom ( below the horizon of the hood and below the windshield wiper). Must be some pretty weak glass - had a Toyota RAV 4 since 2008 and never had a crack.

131.   In a forum titled "2017 xt windshield - I will be on my 4th soon"[24] on subaruforester.org, a consumer with the username "hoshie" with a 2018 Forester XT began the thread on December 24, 2017:

> realize there have been a couple threads on this but it needs another aha.

> These are by far the worst windshields I have ever experienced. Nothing comes close.

---

[23] https://www.subaruoutback.org/threads/windshield-cracked-3-day-old-2017-limited.398690/ (last viewed November 13, 2019).

[24] https://www.subaruforester.org/threads/2017-xt-windshield-i-will-be-on-my-4th-soon.743937/ (last viewed November 13, 2019).

1
They pit at negative temperatures from the tiniest rocks.
They crack soon after.

2
I will be on my 4th soon.

3
Considering the footprint, something needs to be rectified.

4

5
Absolute design flaw. Garbage product.

6
132.   A consumer with the username "Rick's17" with a 2017 Forester

7
Limited responded on this thread on December 24, 2017:

8
Maybe. I got a tiny chip near my windshield pillar and with cold weather, crack is now halfway across windshield

9

10

11
133.   A consumer with the username "saab93ddriver" with a 2017

12
Forester XT responded on this thread on December 25, 2017:

13
I have to say the glass seems to be pretty tender. I'm on my third windshield within a year. I'm in Florida, I'm not sure temperature is a controlling factor. Last time I had it replaced the glass was on national back order and I had to wait 6 weeks, which says to me there is a pretty good demand. Now I got a chip last week, it's not growing so maybe this one can be repaired rather than replacing the whole piece of glass. In my 35 years of driving, before the Forester experience, I replaced 1 windshield in my Honda Element and never had to have any repaired in any of my other vehicles.

14

15

16

17

18

19
134.   A consumer with the username "regajohn" with a 2014 Forester XT

20
CVT responded on this thread regarding his sister's 2017 Forester on December

21
25, 2017:

22
My sister's new (2017) is on its 3rd windshield in fewer than 4,000 miles. The 2nd one broke while she was leaving the dealership (the new glass didn't make it a mile).

23

24

25
Both replacements have been paid for by the dealer / SoA.

26
The glass is definitely thin / weak.

27

28
135.   In a forum titled "2018 Subaru Forester Windshield crack (merged

CLASS ACTION COMPLAINT

thread)"[25] on subaruforester.org, a consumer with the username "safebet" wrote on July 18, 2018:

> My 3 week old 2018 XT windshield just broke this afternoon driving down the road with no cars nearby. No reason at all. A friend and I were returning from lunch and bang! A huge crack straight down from the drivers side and cutting over to the middle of vision. It was 78 degrees outside and no reason whatsoever for this to happen. Not happy.

136.   A consumer with the username "cheeksf16" responded on this thread on July 26, 2018:

> We have had the same issue with our 2017 Forester Touring that we bought new in May 2017. In Jun 2018, we experienced the third windshield crack by a strike so small we didn't hear anything, just saw the crack as it appeared and spread about 12". I have read up on the failed Subaru windshield redesign of the Forester for 2017, called an 'Acoustic' windshield, it was designed to cut down on cabin noise and also to reduce weight, but actually appears to increase the occurrence of cracks versus chips, because the windshields are made using two thin pieces of glass with a laminate in between. The thinner glass on the outside cracks rather than chips requiring replacement rather than repair. Subaru of America (SoA) will not acknowledge there is a problem and therefore, as far as I know, is not working to correct the (non) problem. I have owned 19 cars in over 50 years of driving; I have only replaced one windshield on a 1997 Volvo because of an "excessive number of chip repairs" (not a crack) before buying this Forester. It has been a month since our windshield cracked and it is still not replaced. I tried to replace it on the trip on which it occurred, but an OEM windshield was not available (Subaru of America denies there was/is a shortage of windshields), but I verified the shortage in Richmond, VA with two sources. Once I returned home I took the car to the dealer where I bought it and petitioned to get SoA to replace the windshield but as others have noted on this thread, Subaru claims no responsibility if the crack was caused by "foreign debris" (rock) regardless of the fact that it is their failed design that leads to an abnormal rate of crack damage. An automaker that claims replacing a windshield every 8000 miles (in my case) is normal, is not an automaker to be trusted. In my opinion, Subaru should: 1) acknowledge there is a problem with their windshield design, 2) immediately attack this engineering issue with the objective of a

---

[25] https://www.subaruforester.org/threads/2018-subaru-forester-windshield-crack-merged-thread.780995/ (last viewed November 13, 2019).

'counter' redesign of the windshield to normalize its life expectancy, 3) replace any affected windshield under warranty pending redesign, then once a solution is determined, 4) issue a recall of all affected vehicles to replace remaining faulty windshields. Unfortunately, I don't think we should hold our breath for Subaru to do the right thing and so I am adopting my own policy regarding this problem; that is, I won't replace a cracked windshield unless and until it becomes a distraction to my vision or EyeSight's function, extends from one edge to another, or a second crack occurs (which I know will happen). Additionally, beginning with my current replacement, I will replace with AS1 aftermarket non 'Acoustic' windshield. I will also continue to pass on my experience with Subaru to friends and family as I did on the trip that the current damage occurred. As a result, my son in VA is reconsidering his plan to purchase a new Crosstrek; a close friend in MA is reconsidering plan to trade in Volvo XC 90 on new Outback; my wife's childhood friend in NJ is reconsidering trading in 2012 Outback on new one; and fellow church member here in GA is reconsidering buying a new Outback. If you have similar personal experiences that you wish you had prior to buying your Subaru, I encourage you to pass them on … had I known of this problem ahead of time, I would not have bought the Forester, or any other Subaru.

137. In a forum titled "2019 - Windshield on LONG backorder!"[26] on subaruforester.org, a consumer with the username "hammersc" wrote on February 6, 2019:

cracked windshield

1st day my wife drove her '19 touring, she had a windshield crack from a little rock while on the interstate.

138. A consumer with the username "ctina8" responded on this thread on February 7, 2019:

Same here, first day out with my 18, ended up with a crack in windshield, does Subaru use some kind of cheap glass, ever little stone that hits windshield is making a chip. So annoyed!!

139. In a subforum for Subaru Outback owners on reddit.com, a

---

[26]https://www.subaruforester.org/threads/2019-windshield-on-long-backorder.794211/ (last viewed November 13, 2019).

consumer wrote on January 1, 2017:[27]

    2017 Outback's supercrackable windshield

My wife's 2017 Outback ran into one tiny gravel pellet at 25miles/hr, and boom, we have a growing crack on the windshield now. Googled up windshield replacement and saw there was a Class action on this against Subaru. Called up the dealer, he said they don't handle windshield replacements and asked me to contact Insurance. Called Subaru America, they registered my complaint, and mentioned they don't cover stone hits, and don't know about any faults with the current windshields and asked me to contact the dealer. Its gonna cost either myself/insurance&myself $550 to get this replaced ($350 windshield + $200 labor). On top of it, the dealer gets to re calibrate the eyesight for another $250 For a car that is designed for offroad use, the size of stone that cracked the windshield was something we could have protected with our face without injury. Wondering how many folks here has faced this problem and what they have done about it?

140.   In the reviews section for the 2019 Subaru Forester on cars.com,[28] a consumer wrote on November 21, 2018:

I've only had mine for 2 1/2 weeks. After driving it for 1 week a small rock hit the windshield. I brought it to a reputable glass shop to have it fixed and it spidered when they attempted to fix it. I ordered a new windshield from the dealership last week and it will be another 2 1/2 weeks to get here. Today another very tiny rock hit the windshield and made a star chip that looks like it will spider rapidly. It seems to me that it's a pretty weak windshield and at a $1,000.00 for a new one it's a moneymaker for Subaru/dealership. My 2014 Forester did not have this problem. I am not happy.

141.   On the same cars.com page, another consumer wrote on March 12, 2019:

I've driven the 2019 Subaru Forester Touring model for a month, about 2500 miles. I'll start with the good. The seats are very comfortable and the entertainment system is great. Mine came with a trial subscription to Sirius xm radio and that has been enjoyable. The visibility is

---

[27] https://www.reddit.com/r/subaruoutback/comments/7zavlo/2017_outbacks_supercrackable_windshield/ (last visited November 14, 2019).

[2828] https://www.cars.com/research/subaru-forester-2019/consumer-reviews/ (last viewed November 13, 2019)

1
2
3
4
5
6
7

amazing on the car; there are no blind spots. Plenty of storage and extremely roomy. If all you were going to do is sit in the car you would be happy. Now the cons. It is true that the cup holders are in a very weird and hard to reach place, almost behind you. I'm still not used to that. It's also true that there is only one small cubby in the front that doesn't really hold much. They put the usb outlet deep under there so it's hard to find. The windshield seems to break easily. I got one small rock chip and it put a crack through the entire windshield. I've never had a car that the window breaks in half over a tiny rock chip, and don't think that you're going to get a replacement easily. The replacement windshields are very expensive and there is a two month wait. . . .

8
9
10

142.    On the same cars.com page, another consumer wrote on September 4, 2019:

11
12
13
14
15
16
17
18
19

We bought the 2019 Forested less than 2 months ago in mid July 2019 at 500 miles the windshield cracked from driver side to middle of the passenger side. When we took it into Hueberger a Subaru, Colorado Springs, amazingly the service manager's what he called a chip the size of the end of a ball point pen. It cracked over nite while in the garage. We are at a time there is not gravel on the road and we did not see or hear a rock. Then he said because of the eyesight cameras the glass is thinner than other windshields. Major design flaw in a vehicle built for snow and off road driving! The windshields are 1100.00 installed..so guess we'll have to drive my 2010 Jetta in the snow.. original windshield, or the 2005 Pontiac vibe, original windshield. We have a case # with Subaru and they may warranty one time. I am not happy and the thought that we already have this issue is concerning.

20
21

143.    In the reviews section for the 2019 Subaru Outback on cars.com,[29] a consumer wrote on March 11, 2019:

22
23
24
25
26
27

Very happy with ride, safety features, fit, finish, quality. Gas mileage not great but good. Coincidentally bought it a day before a big snow hit Seattle and was glad to have the AWD. Adaptive cruise control wonderful once you get used to it. StarLink functionality and UI is confusing and frustrating; doubt we will extend the free trial subscription. A month after buying, found a crack that will require an expensive windshield replacement. It traces to a tiny chip, presumably from a small rock we didn't notice. Subaru user forums online discuss potentially vulnerable/weak windshields so prospective

28

[29] https://www.cars.com/research/subaru-outback-2019/consumer-reviews/ (last viewed November 13, 2019)

1    buyers might want to have low deductible on your
2    comprehensive insurance.

3    144.   Defendants had superior and exclusive knowledge of the Defect and
4  knew or should have known that the defect was not known or reasonably
5  discoverable by Plaintiffs and Class Members before they purchased or leased
6  the Class Vehicles.

7    145.   Plaintiffs are informed and believes, and based thereon alleges, that
8  before Plaintiffs purchased their respective Class Vehicles Defendants knew
9  about the Defect through sources not available to consumers, including pre-
10  release testing data, early consumer complaints to Defendants and their dealers,
11  testing conducted in response to those consumer complaints, high cracking rates
12  of the windshield, the data demonstrating the inordinately high volume of
13  replacement part sales, and other aggregate data from Defendants' dealers about
14  the problem.

15    146.   Defendants are experienced in the design and manufacture of
16  consumer vehicles. As an experienced manufacturer, Defendants conduct tests,
17  including pre-sale testing, on incoming components, including the windshield, to
18  verify the parts are free from defect and align with Defendants' specifications.
19  Thus, Defendants knew or should have known the windshield was defective and
20  prone to put drivers in a dangerous position due to the inherent risk of the
21  Defect.

22    147.   Defendants should have learned of this widespread defect from the
23  sheer number of reports received from dealerships. Defendants' customer
24  relations department, which interacts with individual dealerships to identify
25  potential common defects, has undoubtedly received numerous reports regarding
26  the Defect. Defendants' customer relations department also collects and analyzes
27  field data including, but not limited to, repair requests made at dealerships,
28  technical reports prepared by engineers who have reviewed vehicles for which
warranty coverage is being requested, parts sales reports, and warranty claims

1   data.

2        148.   Defendants' warranty department similarly analyzes and collects

3   data submitted by their dealerships to identify warranty trends in their vehicles.

4   It is Defendants' policy that when a repair is made under warranty the dealership

5   must provide Defendants with detailed documentation of the problem and a

6   complete disclosure of the repairs employed to correct it. Dealerships have an

7   incentive to provide detailed information to Defendant, because they will not be

8   reimbursed for any repairs unless the justification for reimbursement is

9   sufficiently detailed.

10       149.   Defendant issued Technical Service Bulletin (TSB) Number 12-192-

11  15R on October 26, 2016, revised on November 19, 2016, that shows its

12  knowledge of the same Defect as it existed in prior model years for two of the

13  three Class Vehicles at issue here. This TSB states that:

14       Subaru of America, Inc. (SOA) Quality Assurance has identified an

15       increase in the number of cracked windshields on some 2015 and 2016MY

16       Legacy and Outback models. Further investigation has determined the root

17       cause for many of these failures to be the ceramic materials used for the

18       black-colored printed perimeter combined with the silver-colored material

19       used for the wiper deicer portion of the windshield glass. In response to this

20       increase, SOA is extending the original warranty on applicable factory-

21       installed windshields to 5 years / unlimited miles. This warranty extension

22       will cover windshield replacement a maximum of **ONE TIME** where

23       applicable on a vehicle with a VIN prior to those listed in the Production

24       Change Information on page 2 and meeting the guidelines outlined in this

25       bulletin.

26       150.   The existence of the Defect is a material fact that a reasonable

27  consumer would consider when deciding whether to purchase or lease a Class

28  Vehicle.  Had Plaintiffs and other Class Members known of the Defect, they

1  would have paid less for the Class Vehicles or would not have purchased or

2  leased them.

3      151.   Reasonable consumers, like Plaintiffs, expect that a vehicle's

4  windshield will function in a manner that will not pose a safety risk and is free

5  from defects. Plaintiffs and Class Members further reasonably expect that

6  Defendants will not sell or lease vehicles with known safety defects, such as the

7  Defect, and will disclose any such defects to their consumers when it learns of

8  them. They did not expect Defendants to conceal and fail to disclose the Defect

9  to them, and to then continually deny its existence.

10              **Defendants Have Actively Concealed the Defect**

11     152.   Despite their knowledge of the Defect in the Class Vehicles,

12 Defendants actively concealed the existence and nature of the defect from

13 Plaintiffs and Class Members.  Specifically, Defendants failed to disclose or

14 actively concealed at and after the time of purchase, lease, or repair:

15          (a)    any and all known material defects or material nonconformity

16                 of the Class Vehicles, including the defects pertaining to the

17                 windshield;

18          (b)    that the Class Vehicles, including the windshields, were not in

19                 good in working order, were defective, and were not fit for

20                 their intended purposes; and

21          (c)    that the Class Vehicles and the windshields were defective,

22                 despite the fact that Defendants learned of such defects as

23                 early as early 2018.

24     153.   When consumers present their Class Vehicles to an authorized

25 Defendants' dealer for windshield repairs, rather than repair the problem under

26 warranty, Defendants' dealers either inform consumers that their vehicles are

27 functioning properly or conduct repairs that merely mask the Defect.

28     154.   Defendants have caused Class Members to expend money at their

1   dealerships to replace the Class Vehicles' windshields and pay for related

2   repairs, despite Defendants' knowledge of the Defect.

3                  **Defendants Have Unjustly Retained A Substantial Benefit**

4          155.   On information and belief, Plaintiffs alleges that Defendants

5   unlawfully failed to disclose the alleged defect to induce them and other putative

6   Class Members to purchase or lease the Class Vehicles.

7          156.   Plaintiffs further alleges that Defendants thus engaged in deceptive

8   acts or practices pertaining to all transactions involving the Class Vehicles,

9   including Plaintiff's.

10         157.   As discussed above therefore, Plaintiffs allege that Defendants

11  unlawfully induced him to purchase his respective Class Vehicles by concealing

12  a material fact (the Defect) and that he would have paid less for the Class

13  Vehicles, or not purchased them at all, had he known of the defect.

14         158.   Accordingly, Defendants' ill-gotten gains, benefits accrued in the

15  form of increased sales and profits resulting from the material omissions that did

16  - and likely will continue to - deceive consumers, should be disgorged.

17                          **CLASS ACTION ALLEGATIONS**

18         159.   Plaintiffs bring this lawsuit as a class action on behalf of themselves

19  and all others similarly situated as members of the proposed Class pursuant to

20  Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the

21  numerosity, commonality, typicality, adequacy, predominance, and superiority

22  requirements of those provisions.

23         160.   The Class and Sub-Class are defined as:

24         **Class**:    All individuals in the United States who
           purchased or leased any Class Vehicle.
25
           **California Sub-Class**:  All members of the Class who
26         purchased or leased their Class Vehicle in the State of
           California.
27
           **CLRA Sub-Class**:  All members of the California Sub-
28         Class who are "consumers" within the meaning of
           California Civil Code § 1761(d).

1
2

**Implied Warranty Sub-Class**:  All members of the Class who took delivery of their vehicles in the State of California.

3      161.  **Colorado Sub-Class**:  All members of the Class who purchased or

4   leased their Class Vehicle in the State of Colorado.Excluded from the Class and

5   Sub-Classes are:  (1) Defendant, any entity or division in which Defendants have

6   a controlling interest, and their legal representatives, officers, directors, assigns,

7   and successors; (2) the Judge to whom this case is assigned and the Judge's staff;

8   (3) any Judge sitting in the presiding state and/or federal court system who may

9   hear an appeal of any judgment entered; and (4) those persons who have suffered

10   personal injuries as a result of the facts alleged herein.  Plaintiffs reserves the

11   right to amend the Class and Sub-Class definitions if discovery and further

12   investigation reveal that the Class and Sub-Class should be expanded or

13   otherwise modified.

14      162.  Numerosity:  Although the exact number of Class Members is

15   uncertain, and can only be ascertained through appropriate discovery, the number

16   is significant enough such that joinder is impracticable.  The disposition of the

17   claims of these Class Members in a single action will provide substantial benefits

18   to all parties and to the Court.  The Class Members are readily identifiable from

19   information and records in Defendants' possession, custody, or control, as well

20   as from records kept by the Department of Motor Vehicles.

21      163.  Typicality:  Plaintiffs' claims are typical of the claims of the Class

22   in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle

23   designed, manufactured, and distributed by Defendants.  The representative

24   Plaintiffs, like all Class Members, has been damaged by Defendants' misconduct

25   in that he has incurred or will incur the cost of repairing or replacing the

26   defective windshield.  Furthermore, the factual bases of Defendants' misconduct

27   are common to all Class Members and represent a common thread resulting in

28   injury to the Class.

1    164.   Commonality:  There are numerous questions of law and fact
2  common to Plaintiffs and the Class that predominate over any question affecting
3  Class Members individually.  These common legal and factual issues include the
4  following:

5              (a)    Whether Class Vehicles suffer from defects relating to the
6                     windshield;

7              (b)    Whether the defects relating to the windshield constitute an
8                     unreasonable safety risk;

9              (c)    Whether Defendants knew about the defects pertaining to the
10                     windshield and, if so, how long Defendants have known of
11                     the defect;

12              (d)    Whether the defective nature of the windshield constitutes a
13                     material fact;

14              (e)    Whether Defendants have had an ongoing duty to disclose the
15                     defective nature of the windshield to Plaintiffs and Class
16                     Members;

17              (f)    Whether Plaintiffs and the other Class Members are entitled
18                     to equitable relief, including a preliminary and/or a permanent
19                     injunction;

20              (g)    Whether Defendants knew or reasonably should have known
21                     of the defects pertaining to the windshield before it sold and
22                     leased Class Vehicles to Class Members;

23              (h)    Whether Defendants should be declared financially
24                     responsible for notifying the Class Members of problems with
25                     the Class Vehicles and for the costs and expenses of repairing
26                     and replacing the defective windshields;

27              (i)    Whether Defendants are obligated to inform Class Members
28                     of their right to seek reimbursement for having paid to

diagnose, repair, or replace their defective windshields;

    (j)    Whether Defendants breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act;

    (k)    Whether Defendants breached the implied warranty of merchantability pursuant to the Song-Beverly Act

    (l)    Whether Defendants breached their express warranties under UCC section 2301; and

    (m)    Whether Defendants breached written warranties pursuant to the Magnuson-Moss Warranty Act.

165.   Adequate Representation:  Plaintiffs will fairly and adequately protect the interests of the Class Members.  Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to vigorously prosecute this action.

166.   Predominance and Superiority:  Plaintiffs and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy.  Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue unabated without remedy or relief.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

1

**FIRST CAUSE OF ACTION**

2

**(Violation of California's Consumers Legal Remedies Act,**

3

**California Civil Code § 1750, *et seq*.)**

4

**(On Behalf of the CLRA Sub-Class)**

5

167.   Plaintiffs incorporate by reference the allegations contained in the

6

preceding paragraphs of this Complaint.

7

168.   Plaintiffs bring this cause of action on behalf of themselves and the

8

CLRA Sub-Class (CLRA Sub-Class).

9

169.   Each Defendant is a "person" as defined by California Civil Code

10

§ 1761(c).

11

170.   Plaintiffs and the CLRA Sub-Class members are "consumers"

12

within the meaning of California Civil Code § 1761(d) because they purchased

13

their Class Vehicles primarily for personal, family, or household use.

14

171.   By failing to disclose and concealing the defective nature of the

15

windshield from Plaintiffs and prospective CLRA Sub-Class members,

16

Defendants violated California Civil Code § 1770(a), as it represented that the

17

Class Vehicles and their windshields had characteristics and benefits that they do

18

not have, and represented that the Class Vehicles and their windshields were of a

19

particular standard, quality, or grade when they were of another.  See Cal. Civ.

20

Code §§ 1770(a)(5) & (7).

21

172.   Defendants' unfair and deceptive acts or practices occurred

22

repeatedly in Defendants' trade or business, were capable of deceiving a

23

substantial portion of the purchasing public, and imposed a serious safety risk on

24

the public.

25

173.   Defendants knew that the Class Vehicles and their windshields

26

suffered from an inherent defect, were defectively designed, and were not

27

suitable for their intended use.

28

174.   As a result of their reliance on Defendants' omissions, owners

1    and/or lessees of the Class Vehicles, including Plaintiffs, suffered an

2    ascertainable loss of money, property, and/or value of their Class Vehicles.

3    Additionally, as a result of the Defect, Plaintiffs and the CLRA Sub-Class

4    members were harmed and suffered actual damages in that the Class Vehicles'

5    windshields are substantially certain to crack or break before their expected

6    useful life has run.

7         175.   Defendants were under a duty to Plaintiffs and the CLRA Sub-

8    Class members to disclose the defective nature of the windshields and/or the

9    associated repair costs because:

10                  (a)    Defendants were in a superior position to know the true state

11                         of facts about the safety defect in the Class Vehicles'

12                         windshields;

13                  (b)    Plaintiffs and the CLRA Sub-Class members could not

14                         reasonably have been expected to learn or discover that their

15                         windshields had a dangerous safety defect until it manifested;

16                         and

17                  (c)    Defendants knew that Plaintiffs and the CLRA Sub-Class

18                         members could not reasonably have been expected to learn of

19                         or discover the safety defect.

20        176.   In failing to disclose the defective nature of windshields, Defendants

21   knowingly and intentionally concealed material facts and breached their duty not

22   to do so.

23        177.   The facts Defendants concealed from or failed to disclose to

24   Plaintiffs and the CLRA Sub-Class members are material in that a reasonable

25   consumer would have considered them to be important in deciding whether to

26   purchase or lease the Class Vehicles or pay less.  Had Plaintiffs and the CLRA

27   Sub-Class members known that the Class Vehicles' windshields were defective,

28   they would not have purchased or leased the Class Vehicles or would have paid

1   less for them.

2       178.   Plaintiffs and the CLRA Sub-Class members are reasonable

3   consumers who do not expect the windshields installed in their vehicles to

4   exhibit problems such as the Defect. This is the reasonable and objective

5   consumer expectation relating to a vehicle's windshield.

6       179.   As a result of Defendants' conduct, Plaintiffs and the CLRA Sub-

7   Class members were harmed and suffered actual damages in that, on information

8   and belief, the Class Vehicles experienced and will continue to experience

9   problems such as the Defect.

10      180.   As a direct and proximate result of Defendants' unfair or deceptive

11  acts or practices, Plaintiffs and the CLRA Sub-Class members suffered and will

12  continue to suffer actual damages.

13      181.   Plaintiffs and the CLRA Sub-Class members are entitled to

14  equitable relief.

15      182.   Plaintiff provided Defendant with notice of its violations of the

16  CLRA pursuant to California Civil Code § 1782(a).  If, within 30 days,

17  Defendant fails to provide appropriate relief for their violations of the CLRA,

18  Plaintiff Patrick will amend this Complaint to seek monetary, compensatory, and

19  punitive damages, in addition to the injunctive and equitable relief that he seeks

20  now on behalf of himself and the CLRA Sub-Class.

## SECOND CAUSE OF ACTION

### (Violation of California Business & Professions Code § 17200, *et seq.*)

### (On Behalf of the California Sub-Class)

24      183.   Plaintiffs incorporates by reference the allegations contained in

25  paragraphs 1 to 167 of this Complaint.

26      184.   Plaintiffs brings this cause of action on behalf of himself and the

27  California Sub-Class (CA Sub-Class).

28      185.   As a result of their reliance on Defendants' omissions, owners

and/or lessees of the Class Vehicles, including Plaintiffs, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs and the CA Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' windshields are substantially certain to fail before their expected useful life has run.

186.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

187.   Plaintiffs and the CA Sub-Class members are reasonable consumers who do not expect their windshields to exhibit problems such as spontaneously and/or unreasonably cracking, chipping and otherwise breaking, and frequent replacement.

188.   Defendants knew the Class Vehicles and their windshields were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

189.   In failing to disclose the Defect, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

190.   Defendants were under a duty to Plaintiffs and the CA Sub-Class members to disclose the defective nature of the Class Vehicles and their windshields because:

   (a)   Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles' windshields; and

   (b)   Defendants actively concealed the defective nature of the Class Vehicles and their windshields from Plaintiffs and the CA Sub-Class.

191.   The facts Defendants concealed from or failed to disclose to Plaintiffs and the CA Sub-Class members are material in that a reasonable

person would have considered them to be important in deciding whether to purchase or lease Class Vehicles.  Had they known of the Defect, Plaintiffs and the other CA Sub-Class members would have paid less for Class Vehicles equipped with the windshields or would not have purchased or leased them at all.

192.   Defendants continued to conceal the defective nature of the Class Vehicles and their windshields even after Plaintiffs and the other CA Sub-Class members began to report problems.

193.   Defendants' conduct was and is likely to deceive consumers.

194.   Defendants' acts, conduct, and practices were unlawful, in that they constituted:

(a)   Violations of California's Consumers Legal Remedies Act;

(b)   Violations of the Song-Beverly Consumer Warranty Act;

(c)   Violations of the Magnuson-Moss Warranty Act; and

(d)   Breach of Express Warranty under California Commercial Code § 2313.

195.   By their conduct, Defendants have engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

196.   Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

197.   As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiffs and the other CA Sub-Class members have suffered and will continue to suffer actual damages.

198.   Defendants have been unjustly enriched and should be required to make restitution to Plaintiffs and the other CA Sub-Class members pursuant to §§ 17203 and 17204 of the Business & Professions Code.

**THIRD CAUSE OF ACTION**

**(Breach of Implied Warranty Pursuant to Song-Beverly**

**Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, *et seq.*)**

**(On Behalf of the Implied Warranty Sub-Class)**

199.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 to 167 of this Complaint.

200.   Plaintiffs bring this cause of action against Defendants on behalf of himself and the Implied Warranty Sub-Class (IW Sub-Class).

201.   Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.  Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

202.   Defendants provided Plaintiffs and the IW Sub-Class members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their windshields suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

203.   Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their windshields, which were manufactured, supplied, distributed, and/or sold by Defendants, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their windshields would be fit for their intended use.

204.   Contrary to the applicable implied warranties, the Class Vehicles and their windshields at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the IW Sub-Class

members with reliable, durable, and safe transportation.  Instead, the Class

Vehicles are defective, including the defective windshields.

205.   The alleged Defect is inherent and was present in each Class

Vehicle at the time of sale.

206.   As a result of Defendants' breach of the applicable implied

warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable

loss of money, property, and/or value of their Class Vehicles. Additionally, as a

result of the Defect, Plaintiffs and the IW Sub-Class members were harmed and

suffered actual damages in that the Class Vehicles' windshields are substantially

certain to fail before their expected useful life has run.

207.   Defendants' actions, as complained of herein, breached the implied

warranty that the Class Vehicles were of merchantable quality and fit for such

use in violation of California Civil Code §§ 1792 and 1791.1.

**FOURTH CAUSE OF ACTION**

**(Violation of the Colorado Consumer Protection Act,**

**Colo. Rev. Stat. §§ 6-1-101 *et seq.*)**

**(On Behalf of the Colorado Sub-Class)**

208.   Plaintiffs incorporate by reference and re-allege the allegations

contained in paragraphs 1-167 of this Complaint.

209.   Plaintiff Stephen Moreno ("Colorado Plaintiff") brings this cause of

action on his own behalf and on behalf of the members of the Colorado Sub-

Class.

210.   Subaru is a "person" within the meaning of the Colorado Consumer

Protection Act ("CCPA"), COLO. REV. STAT. § 6-1-102.

211.   The CCPA prohibits a person from engaging in a "deceptive trade

practice," including "knowingly mak[ing] a false representation as to the

characteristics, ingredients, uses, benefits, alterations, or quantities of goods

[…];" "represent[ing] that goods, good, services, or property are of a particular

1    standard, quality, or grade, […] if he knows or should know that they are of

2    another;" and "advertis[ing] goods, services, or property with intent not to sell

3    them as advertised." COLO. REV. STAT. § 6-1-105(1)(e), (g), and (i).

4    212. Subaru participated in deceptive trade practices that violated the

5    CCPA as described below and alleged throughout the Complaint. By failing to

6    disclose the Defect, by concealing the Defect, by marketing its vehicles as safe,

7    reliable, easily operable, efficient, and of high quality, and by presenting itself as

8    a reputable manufacturer that valued safety, cleanliness, performance and

9    efficiency, and stood behind its vehicles after they were sold, Subaru knowingly

10   and intentionally misrepresented and omitted material facts in connection with

11   the sale or lease of the Class Vehicles. Subaru systematically misrepresented,

12   concealed, suppressed, or omitted material facts relating to the Class Vehicles

13   and the Defect in the course of its business.

14   213. Subaru also engaged in unlawful trade practices by employing

15   deception, deceptive acts or practices, fraud, misrepresentations, or concealment,

16   suppression or omission of any material fact with intent that others rely upon

17   such concealment, suppression or omission, in connection with the sale of the

18   Class Vehicles.

19   214. Subaru's unfair and deceptive acts or practices occurred repeatedly

20   in Subaru's trade or business, were capable of deceiving a substantial portion of

21   the purchasing public, and imposed a serious safety risk on the public.

22   215. Subaru knew that the Class Vehicles and their transmissions

23   suffered from an inherent defect, were defectively designed or manufactured, and

24   were not suitable for their intended use.

25   216. Subaru knew or should have known that its conduct violated the

26   CCPA.

27   217. Colorado Plaintiff and the Colorado Sub-Class Members reasonably

28   relied on Subaru's misrepresentations and omissions of material facts in its

advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

218.   Had Colorado Plaintiff and the Colorado Sub-Class Members known that the Class Vehicles would exhibit the Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Subaru's misconduct.

219.   Colorado Plaintiff and the Colorado Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Subaru's conduct, Colorado Plaintiff and the Colorado Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

220.   As a result of Subaru's conduct, Colorado Plaintiff and the Colorado Sub-Class Members were harmed and suffered actual damages as a result of Subaru's misrepresentations and omissions with regard to their Class Vehicles windshields because they purchased vehicles which do not perform as advertised.

221.   As a direct and proximate result of Subaru's unfair or deceptive acts or practices, Colorado Plaintiff and the Colorado Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

222.   Colorado Plaintiff and the Colorado Sub-Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages, under the CCPA.

**FIFTH CAUSE OF ACTION**

**(Breach of Implied Warranty of Merchantability, Colo. Rev. Stat.  §§ 4-2-313 AND 4-2.5-212)**

**(On Behalf of the Colorado Sub-Class)**

223.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-167 of this Complaint.

224.   Colorado Plaintiff brings this cause of action on his own behalf and

on behalf of the members of the Colorado Sub-Class.

225.   Subaru is and was at all relevant times a "merchant" with respect to motor vehicles under COLO. REV. STAT. §§ 4-2-104(1) and 4-2.5-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

226.   With respect to leases, Subaru is and was at all relevant times a "lessor" of motor vehicles under COLO. REV. STAT. § 4-2.5-103(1)(p).

227.   The Class Vehicles are and were at all relevant times "goods" within the meaning of COLO. REV. STAT. §§ 4-2-105(1) and 4-2.5-103(1)(h).

228.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under COLO. REV. STAT. §§ 4-2-313 and 4-2.5-212.

229.   Subaru knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Subaru directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Colorado Plaintiff and the Colorado Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Subaru knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Colorado Plaintiff and the Colorado Sub-Class Members, with no modification to the defective transmissions.

230.   Subaru provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

231.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

232.   Contrary to the applicable implied warranties, the Class Vehicles

and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and/or manufacture of their windshields and the existence of the Defect at the time of sale or lease and thereafter. Subaru knew of this defect at the time these sale or lease transactions occurred.

233.   As a result of Subaru's breach of the applicable implied warranties, Colorado Plaintiff and the Colorado Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Colorado Plaintiff and the Colorado Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' windshields are substantially certain to crack or otherwise fail before their expected useful life has run.

234.   Subaru's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of COLO. REV. STAT. §§ 4-2-313 and 4-2.5-212.

235.   Colorado Plaintiff and the Colorado Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein.

236.   Colorado Plaintiff and the Colorado Sub-Class Members were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of written warranty would have been futile. Subaru was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Colorado Sub-Class Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

237.   As a direct and proximate cause of Subaru's breach, Colorado Plaintiff and the Colorado Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Colorado Plaintiff and the Colorado Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

238.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, Colorado Plaintiff and the Colorado Sub-Class Members have been damaged in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**

**(Breach of Warranty under the Magnuson-Moss Warranty Act,**

**15 U.S.C. § 2303 *et seq*.)**

**(On Behalf of the Class)**

239.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 to 167 of this Complaint.

240.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Class against Defendants.

241.   Defendants provided all purchasers and lessees of the Class Vehicles with an express warranty described infra, which became a material part of the bargain. Accordingly, Defendants' express warranty is an express warranty under California law.

242.   The windshields were manufactured and/or installed in the Class Vehicles by Defendants and are covered by the express warranty.

243.   In a section entitled "What Is Covered," Defendants' express warranty provides in relevant part that "These warranties cover any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use: . . . in any part of the 2017 model year Subaru which is identified on the inside front cover of this

1 | Warranty & Maintenance Booklet(the "vehicle")."

2 | 244. According to Defendants, "BASIC COVERAGE is 3 years or
3 | 36,000 miles, whichever comes first."

4 | 245. Defendants breached the express warranties by selling and leasing
5 | Class Vehicles with windshields that were defective, requiring repair or
6 | replacement within the warranty period, and refusing to honor the express
7 | warranty by repairing or replacing, free of charge, the windshields, and instead,
8 | replacing the defective windshields with equally defective windshields. By
9 | simply replacing Plaintiffs' and Class Members' defective windshields with
10 | similarly defective windshields, Defendants have failed to "repair" the defects as
11 | alleged herein.

12 | 246. Plaintiffs were not required to notify Defendants of the breach or
13 | was not required to do so because affording Defendants a reasonable opportunity
14 | to cure their breach of written warranty would have been futile. Defendants were
15 | also on notice of the defect from complaints and service requests it received from
16 | Class Members, from repairs and/or replacements of the windshield, and from
17 | other internal sources.

18 | 247. As a direct and proximate cause of Defendants' breach, Plaintiffs
19 | and the other Class members have suffered, and continue to suffer, damages,
20 | including economic damages at the point of sale or lease. Additionally, Plaintiffs
21 | and the other Class members have incurred or will incur economic damages at
22 | the point of repair in the form of the cost of repair.

23 | 248. Plaintiffs and the other Class members are entitled to legal and
24 | equitable relief against Defendant, including actual damages, consequential
25 | damages, specific performance, attorneys' fees, costs of suit, and other relief as
26 | appropriate.

27

28

CLASS ACTION COMPLAINT

**SEVENTH CAUSE OF ACTION**

**(Breach of Implied Warranty under the Magnuson-Moss Warranty Act,**

**15 U.S.C. § 2303 *et seq.*)**

**(On Behalf of the Class)**

249.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 to 167 of this Complaint.

250.   Plaintiffs bring this cause of action on behalf of themselves and the Class against Defendant.

251.   The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

252.   Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

253.   Each Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

254.   Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their windshields were manufactured, supplied, distributed, and/or sold by Defendants would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their windshields would be fit for their intended use while the Class Vehicles were being operated.

255.   Contrary to the applicable implied warranties, the Class Vehicles and their windshields at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including the defective design of their windshields.

256.   Defendants' breach of implied warranties has deprived Plaintiffs and Class members of the benefit of their bargain.

257.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

258.   Defendants have been afforded a reasonable opportunity to cure their breach, including when Plaintiffs and Class members brought their vehicles in for diagnoses and repair of the windshields.

259.   As a direct and proximate cause of Defendants' breach of implied warranties, Plaintiffs and Class members sustained and incurred damages and other losses in an amount to be determined at trial.  Defendants' conduct damaged Plaintiffs and Class members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

260.   As a result of Defendants' violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class members have incurred damages.

## EIGHTH CAUSE OF ACTION
### (For Unjust Enrichment)
### (On Behalf of the Class)

261.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 to 167 of this Complaint.

262.   Plaintiffs bring this cause of action on behalf of himself and the Class.

263.   As a direct and proximate result of Defendants' failure to disclose known defects, Defendants have profited through the sale and lease of the Class Vehicles.  Although these vehicles are purchased through Defendants' agents, the money from the vehicle sales flows directly back to Defendant.

264.   Additionally, as a direct and proximate result of Defendants' failure

to disclose known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

265.   Defendants have been unjustly enriched due to the known defects in the Class Vehicles through the use money paid that earned interest or otherwise added to Defendants' profits when said money should have remained with Plaintiffs and Class Members.

266.   As a result of the Defendants' unjust enrichment, Plaintiffs and Class Members have suffered damages.

## RELIEF REQUESTED

267.   Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendant, as follows:

(a)   An order certifying the proposed Class and Sub-Classes, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

(a)   A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the windshields, including the need for periodic maintenance;

(b)   An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to.  49 U.S.C. § 30118(a); compelling Defendant to remove, repair, and/or replace the Class Vehicles' defective windshields with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Defendant from selling the Class Vehicles with the misleading information; and/or compelling Defendant to reform their warranty, in a manner deemed to be

1  appropriate by the Court, to cover the injury alleged and to
2  notify all Class Members that such warranty has been
3  reformed;

4  (c)  A declaration requiring Defendant to comply with the various
5  provisions of the Song-Beverly Act alleged herein and to
6  make all the required disclosures;

7  (d)  An award to Plaintiffs and the Class for compensatory,
8  exemplary, and statutory damages, including interest, in an
9  amount to be proven at trial; except that Plaintiffs do not
10  currently seek monetary damages under the Consumers Legal
11  Remedies Act;

12  (e)  Any and all remedies provided pursuant to the Song-Beverly
13  Act, including California Civil Code section 1794;

14  (f)  Any and all remedies provided pursuant to the Magnuson-
15  Moss Warranty Act;

16  (g)  A declaration that Defendant must disgorge, for the benefit of
17  the Class, all or part of the ill-gotten profits it received from
18  the sale or lease of the Class Vehicles or make full restitution
19  to Plaintiffs and Class Members;

20  (h)  An award of attorneys' fees and costs, as allowed by law;

21  (i)  An award of attorneys' fees and costs pursuant to California
22  Code of Civil Procedure § 1021.5;

23  (j)  An award of pre-judgment and post-judgment interest, as
24  provided by law;

25  (k)  Leave to amend the Complaint to conform to the evidence
26  produced at trial; and

27  (l)  Such other relief as may be appropriate under the
28  circumstances.

CLASS ACTION COMPLAINT

1

**DEMAND FOR JURY TRIAL**

2       268.   Pursuant to Federal Rule of Civil Procedure 38(b) and Central

3 District of California Local Rule 38-1, Plaintiffs demands a trial by jury of all

4 issues in this action so triable.

5

6 Dated:  December 5, 2019                    Respectfully submitted,

                                              **Capstone Law APC**
7

8

9                                        By: /s/ *Steven Weinmann*
                                             Steven Weinmann
10                                           Tarek H. Zohdy
                                             Cody R. Padgett
11                                           Trisha K. Monesi

12                                           /s/ *Russell D. Paul*
                                             Russell D. Paul
13                                           Amey J. Park
14                                           **BERGER MONTAGUE PC**

15                                           Attorneys for Plaintiffs and the Class

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

DocuSign Envelope ID: 2C0C1F1B-7371-43F8-9989-0FE24CFDA4ED

1   Steven Weinmann (SBN 190956)
    Steven.Weinmann@capstonelawyers.com
2   Tarek H. Zohdy (SBN 247775)
    Tarek.Zohdy@capstonelawyers.com
3   Cody R. Padgett (SBN 275553)
    Cody.Padgett@capstonelawyers.com
4   Trisha K. Monesi (SBN 303512)
    Trisha.Monesi@capstonelawyers.com
5   Capstone Law APC
    1875 Century Park East, Suite 1000
6   Los Angeles, California 90067
    Telephone:  (310) 556-4811
7   Facsimile:   (310) 943-0396

8   Russell D. Paul (*pro hac vice* pending)
    rpaul@bm.net
9   Amey J. Park (*pro hac vice* pending)
    apark@bm.net
10  BERGER MONTAGUE P.C.
    1818 Market Street, Suite 3600
11  Philadelphia, PA  19103
    Telephone:  (215) 875-3000
12  Facsimile:   (215) 875-4604

13  Attorneys for Plaintiffs

14                  UNITED STATES DISTRICT COURT

15                  CENTRAL DISTRICT OF CALIFORNIA

16

17  GORDON ARMSTRONG,                    Case No.:
    ANDREW VIERRA, SANDY
18  MORENO and STEPHEN
    MERMAN, individually, and on         **DECLARATION OF GORDON**
19  behalf of a class of similarly situated   **ARMSTRONG IN SUPPORT OF**
    individuals,                         **VENUE FOR CLASS ACTION**
20                                       **COMPLAINT PURSUANT TO**
                Plaintiffs,              **CIVIL CODE § 1780(d)**
21
            v.
22
    SUBARU OF AMERICA, INC. and
23  FUJI HEAVY INDUSTRIES, LTD.,
24
                Defendants.
25

26

27

28

DocuSign Envelope ID: 2C0C1F1B-7374-43F8-9989-0F524CFDA4ED

# DECLARATION OF GORDON ARMSTRONG

I, GORDON ARMSTRONG, declare under penalty of perjury as follows:

1.      I make this declaration based upon my personal knowledge except as to those matters stated herein that are based upon information and belief, and as to those matters, I believe them to be true.  I am over the age of eighteen, a citizen of the State of California, and a Plaintiff in this action.

2.      Pursuant to California Civil Code §1780(d), this Declaration is submitted in support of Plaintiff's Selection of Venue for the Trial of Plaintiffs' Cause of Action alleging violation of California's Consumers Legal Remedies Act.

3.      I reside in Santa Clarita, California, which is in the County of Los Angeles.  I purchased a 2017 Subaru Outback that is the subject of this lawsuit in California and accepted delivery of the vehicle in the County of Ventura.

4.      I am informed and believe that Defendant Subaru of America, Inc. ("SOA" or "Subaru") is a New Jersey corporation organized and existing under the laws of the State of New Jersey and is registered to conduct business in California. Subaru's corporate headquarters and principal place of business is located at One Subaru Drive, Camden, New Jersey 08103.  On information and belief, Defendant conducts business in Los Angeles and Ventura County.

5.      Based on the facts set forth herein, this Court is a proper venue for the prosecution of Plaintiff's Cause of Action alleging violation of California's Consumers Legal Remedies Act because my 2017 Subaru Outback that is the subject of this lawsuit is situated here, and a substantial portion of the events giving rise to my claims occurred here.

6.      I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed on December 5, 2019, in Santa Clarita, California.

DocuSigned by:

_____
3C4B6F75AE8D42C...
Gordon Armstrong

DECL. OF GORDON ARMSTRONG IN SUPPORT OF PLAINTIFF'S SELECTION OF VENUE FOR TRIAL